UNITED STATES EX REL. SKINNER & EDDY CORPORATION *v.* McCARL, COMPTROLLER GENERAL.

CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 30.   Argued April 14, 18, 1927.—Decided October 10, 1927.

1. Claims arising out of contracts with the Emergency Fleet Corporation are not within the jurisdiction of the Comptroller General. P. 4.
2. The Fleet Corporation is an entity distinct from the United States and from any of its departments or boards; and the audit and control of its financial transactions is, under the general rules of law and the administrative practice, committed to its own corporate officers except so far as control may be exerted by the Shipping Board. P. 11.
3. The power to settle and adjust claims arising from contracts made and cancelled by the Fleet Corporation under the power delegated by the President under the Acts of June 15, 1917, and April 22 and November 4, 1918, is conferred by § 2(c) of the Merchant Marine Act, 1920, on the Shipping Board. P. 11.
4. The requirement of Rev. Stats., § 951, that in suits by the United States against individuals no claim for a credit shall be admitted unless it shall have been presented to the accounting officers of the Treasury and by them disallowed, is satisfied when the claim is presented and disallowed by the officer who has power to allow the claim, although he is not a general accounting officer of the Government. P. 12.

8 F. (2d) 1011, affirmed.

83583°—28——1                                          1

CERTIORARI, 270 U. S. 626, to a judgment of the Court of Appeals of the District of Columbia which affirmed the Supreme Court of the District in dismissing a petition for a writ of mandamus, which was sought by Skinner & Eddy in order to compel the Comptroller General to pass upon its claims against the Government, growing out of contracts with the Emergency Fleet Corporation.

*Mr. Louis Titus,* with whom *Mr. J. Barrett Carter* was on the brief, for petitioner.

*Mr. Gardner P. Lloyd,* Special Assistant to the Attorney General, with whom *Solicitor General Mitchell* was on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This is a petition for a writ of mandamus brought in the Supreme Court of the District of Columbia in October, 1924. The relator, Skinner & Eddy Corporation, seeks to compel the Comptroller General to pass upon its claims against the Government. These arise under contracts made during the years 1917, 1918 and 1919 with the United States Shipping Board Emergency Fleet Corporation. Most of the contracts refer to the corporation as " representing the United States." The claims were presented to the Comptroller General for allowance, because Skinner & Eddy wished to be in a position to use them as a credit, if the United States should, as was threatened, sue on the contracts. It deemed this course necessary, because § 951 of the Revised Statutes (United States Code, Title 28, § 774) provides: " In suits brought by the United States against individuals, no claim for a credit shall be admitted, upon trial, except such as appear to have been presented to the accounting officers of the Treasury, for their examination, and to have been by them

disallowed . . . ." Compare *United States* v. *Fisher Flouring Mills Co.,* 295 Fed. 691; 17 F. (2d) 232. The Comptroller General declines to consider the claims, asserting that he has neither the duty, nor the power to do so; and that the duty of passing upon them rests with the Shipping Board.

In 1923, the Fleet Corporation assigned to the United States, all of its assets, including accounts against divers persons for the payment of money. Thus, the United States is the owner, either as principal or as assignee of the Fleet Corporation, of all the claims against Skinner & Eddy. Two actions arising out of these contracts are now pending in the federal court for the Western District of Washington. One is a suit by Skinner & Eddy against the Fleet Corporation begun in 1923 in a state court of Washington and removed to the federal court. In that case, the defendant has moved to dismiss the suit on the ground that the claim sued on is one against the United States.[1] The other action is a suit by the United States against Skinner & Eddy, commenced in the federal court since this petition for a writ of mandamus was filed.

The question whether the writ of mandamus should issue is presented by a demurrer to the plea and traverse which was interposed to the answer. The Supreme Court of the District sustained the demurrer and dismissed the petition without opinion. Its judgment was affirmed by the Court of Appeals of the District, 8 F. (2d) 1011. This Court granted a writ of certiorari. 270 U. S. 636. The Government insists that the petition was properly dismissed, because claims arising out of contracts with the Fleet Corporation are not within the jurisdiction of the Comptroller General; and that even if they were, the

---

[1] In 1923, Skinner & Eddy began still another suit, upon the same cause of action, against the United States in the Court of Claims. It was finally allowed to dismiss that suit without prejudice. See *In re Skinner & Eddy Corporation,* 265 U. S. 86.

relief was properly denied, because his refusal to consider the claims was a disallowance thereof within the meaning of § 951, and thereby the requirement of that section was satisfied. It is conceded that mandamus is an appropriate remedy. Compare *Interstate Commerce Commission* v. *Humboldt S. S. Co.*, 224 U. S. 474.

The first contention involves a determination of the powers and duties of the Comptroller General and of the United States Shipping Board in respect to claims arising out of transactions of the Fleet Corporation. The powers and duties formerly "imposed by law upon the Comptroller of the Treasury or the six auditors of the Treasury Department" were transferred to the Comptroller General by Act of June 10, 1921, c. 18, Title III, §§ 301–304, 42 Stat. 20, 23, 24, (United States Code, Title 31, § 44). Section 305, amending § 236 of the Revised Statutes, provides: "All claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office." [2] The language of this grant, if standing alone, might possibly be broad enough to include authority to audit accounts and to pass upon claims

---

[2] The accounting branch of the Treasury Department was created by the Act of September 2, 1789, c. 12, §§ 1, 3, 5, 1 Stat. 65, 66. Steps in its growth and in the development of its control over Government expenditures may be traced in the Acts of May 8, 1792, c. 37, § 1, 1 Stat. 279; July 16, 1798, c. 85, § 1, 1 Stat. 610; March 3, 1817, c. 45, §§ 1, 3-5, 3 Stat. 366, 367; May 7, 1822, c. 90, 3 Stat. 688; March 30, 1868, c. 36, 15 Stat. 54; June 8, 1872, c. 335, §§ 21-25, 17 Stat. 283, 287-288. In 1894 there was a general revision of the statutes dealing with the accounting officers. Act of July 31, 1894, c. 174, 28 Stat. 162, 205-211. The powers and duties there outlined were in the main those transferred to the General Accounting Office by the Act of 1921.

The question of the jurisdiction of the Comptroller General is not a question as to bookkeeping merely. The decision of the

arising out of contracts made by a Government-owned corporation "representing the United States." But here it must be construed in the light of the statutes dealing specifically with the Shipping Board and the Fleet Corporation, of the latter's origin and character and of the administrative practice prevailing with regard to it and other similar corporations.

The Fleet Corporation was organized on April 16, 1917—ten days after the United States declared war. All of its stock was subscribed and paid for by the Shipping Board on behalf of the United States. And all the stock has been held by it since. The company was formed by the Shipping Board pursuant to the specific authority to form one or more corporations, which was conferred by the original Shipping Board Act, September 7, 1916, c. 451, § 11, 39 Stat. 728, 731. Congress conferred this authority in contemplation of the possibility of war, and it required that any such corporation should be dissolved "at the expiration of five years from the conclusion of the present European War." The Fleet Corporation is thus an instrumentality of the Government. See *United States* v. *Walter*, 263 U. S. 15, 18. But it was organized under the general laws of the District of Columbia, as a private corporation, with power to purchase, construct and operate merchant vessels. The Act authorized the Board "to sell with the approval of the President, any or all of the stock of the United States in such corporation, but at no time

Comptroller General upon the allowance of accounts within his jurisdiction is conclusive upon the executive branch of the Government. Act of July 31, 1894, c. 174, § 8, 28 Stat. 162, 207; following the provisions of the earlier Act of March 30, 1868, c. 36, 15 Stat. 54. Save in cases where resort is had to the courts, therefore, the Comptroller is the final arbiter as to the legality of expenditures. See Annual Report of the General Accounting Office, 1924, p. 3. See *St. Louis, Brownsville & M. Ry. Co.* v. *United States*, 268 U. S. 169, 173-174.

shall it be a minority stockholder therein." Being a private corporation, the Fleet Corporation may be sued in the state or federal courts like other private corporations; it does not enjoy the priority of the United States in bankruptcy proceedings, *Sloan Shipyards Corporation* v. *United States Shipping Board Emergency Fleet Corporation,* 258 U. S. 549; and its employees are not agents of the United States, subject to the provisions of § 41 of the Criminal Code. *United States* v. *Strang,* 254 U. S. 491. Compare 34 Op. Atty. Gen. 241.

Government-owned private corporations were employed by the United States as its instrumentalities in several other fields during the World War. The Food Administration Grain Corporation (later called the United States Grain Corporation) was organized under the laws of Delaware under the Food Control Act, August 10, 1917, c. 53, § 19, 40 Stat. 276. See Act of March 4, 1919, c. 125, 40 Stat. 1348, and Executive Orders, August 14, 1917, March 4, 1919. The United States Spruce Corporation was organized by the Director of Air Craft Production under the laws of the District of Columbia, pursuant to the Act of July 9, 1918, c. 143, 40 Stat. 845, 888–889, for the purpose of aiding in the production of aircraft material. The United States Housing Corporation was organized under the laws of the District of Columbia by authority of the President, for the purpose of providing housing for war needs under the Act of June 4, 1918, c. 92, 40 Stat. 594, 595. The War Finance Corporation was organized under the Act of April 5, 1918, c. 45, 40 Stat. 506, to assist financially, industries important to the successful prosecution of the War. For many years before the War, the Government had employed the Panama Railroad Company as its instrumentality in connection with the Canal.[3] And, since

---

[3] The United States acquired all the stock in the Panama Rail Road Company in order that the railroad, with its adjuncts, might be used in the manner most helpful to the Government in constructing the

the War, the Inland Waterways Corporation has been organized by the Secretary of War to operate the Government-owned inland waterways system pursuant to the Act of June 3, 1924, c. 243, 43 Stat. 360. The Government likewise has established, and holds all the stock in the Federal Intermediate Credit Banks, formed under the Act of March 4, 1923, c. 252, § 205, 42 Stat. 1454, 1457, to bring about easier agricultural credits.[4]

At no time, during the War, or since its close, have the financial transactions of the Fleet Corporation passed through the hands of the general accounting officers of the Government or been passed upon, as accounts of the United States, either by the Comptroller of the Treasury or the Comptroller General.[5] The accounts of the Fleet Corporation, like those of each of the other corporations named, and like those of the Director General of Railroads during Federal Control,[6] have been audited, and the control over their financial transactions has been exercised, in accordance with commercial practice, by the board or the officer charged with the responsibilities of

Canal. See letter of Wm. H. Taft, Secretary of War, in Annual Report of Isthmian Canal Commission, 1904, pp. 13–15; Annual Report of Directors of Panama Rail Road, 1904, pp. 8–9; Annual Report of Isthmian Canal Commission, 1905, p. 18. For a list of the functions performed through the agency of the Rail Road, see Annual Report of Governor of Panama Canal, 1921, Chart facing p. 55. See also Panama Canal Act, August 24, 1912, c. 390, § 6, 37 Stat. 560, 563–564. On the auditing of Rail Road accounts, see Annual Report of Isthmian Canal Commission, 1905, p. 179; Annual Report of Governor of Panama Canal, 1915, p. 42.

[4] The Government also held over 98% of the stock in the Federal Land Banks, when they were first created under the Act of July 17, 1916, c. 245, § 5, 39 Stat. 360, 364, but its holding now amounts to less than 2%. See Annual Reports of the Secretary of the Treasury, 1917, p. 38; 1926, p. 106.

[5] See Annual Report of Comptroller of the Treasury, 1919, pp. 23-26.

[6] See the Federal Control Act, March 21, 1918, c. 25, § 12, 40 Stat. 451, 457.

administration.[7] Indeed, an important if not the chief reason for employing these incorporated agencies was to enable them to employ commercial methods and to conduct their operations with a freedom supposed to be inconsistent with accountability to the Treasury under its established procedure of audit and control over the financial transactions of the United States.[8] It is true that a kind of audit of the Fleet Corporation's transactions was later made by the general accounting officers pursuant to special legislation, said to have been enacted at the request of the Shipping Board. But there is no contention that these statutes, or the audit made thereunder, affect in any way the question here presented,[9] save that they may show Congressional approval of the practice theretofore prevailing. It may be that the other corporations above-mentioned expended no moneys

---

[7] The accounts of the Housing Corporation were handled by the Comptroller of the Treasury and his successors after the passage of the Act of July 11, 1919, c. 6, 41 Stat. 35, 55-56, providing that the funds of the Corporation be covered into the Treasury.

[8] See e. g. Annual Report of Inland Waterways Corporation, 1925, pp. 2-3.

[9] The Appropriation Act of July 1, 1918, c. 113, 40 Stat. 634, 651, directed the Secretary of the Treasury " to cause an audit to be made of the financial transactions of the United States Shipping Board Emergency Fleet Corporation, under such rules and regulations as he shall prescribe "; the Appropriation Act of March 20, 1922, c. 104, 42 Stat. 437, 444, directed the Comptroller General to make such audit, commencing July 1, 1921, " in accordance with the usual methods of steamship or corporation accounting and under such rules and regulations as he shall prescribe." These special audits were of a nature to afford some information concerning past transactions. But the Acts did not vest control over expenditures either in the Secretary of the Treasury or in the General Accounting Officer making the audit; and none was asserted. The nature, occasion and purpose of these special audits is set forth in the Annual Reports of the Comptroller of the Treasury, 1919, pp. 23-26; 1920, pp. 24-41; and in the Annual Reports of the General Accounting Office, 1923, p. 34; 1924, p. 12; 1926, p. 45-46.

appropriated by Congress save those received from the sale of stock to the Government, whereas the Fleet Corporation had the benefit of money appropriated to the Shipping Board and by it turned over to the Corporation.[10] The first statute making such an appropriation, however, provided in terms that the moneys were to be expended " as other moneys of said corporation are now expended." Act of June 15, 1917, c. 29, 40 Stat. 182, 183.

The transactions of the Fleet Corporation arose out of the exercise of powers conferred upon it in several different ways. It was urged in the argument that the question of the jurisdiction of the Comptroller General would depend upon the source of the power giving rise to the transactions under consideration, because of certain special statutory provisions as to compensation for claimants, now to be considered. Besides powers conferred by the general incorporation laws of the District of Columbia, the Fleet Corporation was vested, by delegation from the President,[11] with the powers conferred upon him by Acts of June 15, 1917, c. 29, 40 Stat. 182; April 22, 1918, c. 62, 40 Stat. 535; and November 4, 1918, c.

---

[10] See, in addition to the appropriation act referred to in the text, the Acts of October 6, 1917, c. 79, 40 Stat. 345; July 1, 1918, c. 113, 40 Stat. 634, 650; June 5, 1920, c. 235, 41 Stat. 874, 891; March 4, 1921, c. 161, 41 Stat. 1367, 1382; August 24, 1921, c. 89, 42 Stat. 192; June 12, 1922, c. 218, 42 Stat. 635, 647-648; February 13, 1923, c. 72, 42 Stat. 1227, 1241-1242; June 7, 1924, c. 292, 43 Stat. 521, 530-531; March 3, 1925, c. 468, 43 Stat. 1198, 1209-1210. The last four of the appropriation acts referred to provide that " No part of the sums appropriated . . . shall be available for the payment of certified public accountants . . . and all auditing of every nature requiring the services of outside auditors shall be furnished through the Bureau of Efficiency: *Provided,* That nothing herein contained shall limit the . . . United States Shipping Board Emergency Fleet Corporation from employing outside auditors to audit claims in litigation for or against the . . . Corporation."

[11] See Executive Orders, No. 2664, July 11, 1917; No. 2888, July 18, 1918; No. 3018, Dec. 3, 1918.

201, 40 Stat. 1020, 1022. Among them were the power to construct vessels and the power to modify, suspend, cancel or requisition existing or future contracts for the construction of vessels. The Act of June 15, 1917 provided also that when the United States should cancel or requisition any contract, it should make just compensation to be determined by the President; and that, if the persons concerned were dissatisfied with that determination, 75 per cent. of the amount so determined was to be paid; and that suit for the additional amount claimed might be brought against the United States, in the manner provided in § 24 (20) and § 145 of the Judicial Code. The Merchant Marine Act 1920, June 5, 1920, c. 250, § 2, 41 Stat. 988, repealed the provisions of the Acts of 1917 and 1918 above referred to; but it preserved all rights and remedies accruing as a result of any action taken under the provisions repealed; provided by § 2 (b) for their enforcement as though the Act had not been passed, except that, as provided in § 2 (c), the Shipping Board should as soon as practicable " adjust, settle, and liquidate all matters arising out of or incident to the exercise by or through the President of any of the powers or duties conferred or imposed upon the President by any such Act or parts of Acts; and for this purpose the board, instead of the President, shall have and exercise any such powers and duties relating to the determination and payment of just compensation: *Provided*, That any person dissatisfied with any decision of the board shall have the same right to sue the United States as he would have had if the decision had been made by the President of the United States under the Acts hereby repealed."

The claims of Skinner & Eddy were mainly for the cancellation by the Fleet Corporation of contracts for the construction of vessels. The Government contends that the contract giving birth to the claims arose out of or was incident to the exercise by or through the President

of the powers conferred upon him by the statutes referred to in § 2 (c) of the Merchant Marine Act, 1920, and, hence, that the Shipping Board, and not the Comptroller General, has the power and duty to settle and adjust them and thus to allow or disallow any claims by way of credits or set-offs arising out of the contracts. Skinner & Eddy urge that their contracts were made by virtue of the power conferred upon the Fleet Corporation by the Shipping Act of 1916; that a controversy arising out of such contracts is not within § 2 (c) of the Merchant Marine Act, 1920; and that, hence, the Comptroller General had jurisdiction over its claims. We have no occasion to determine whether the contracts here in question were made under the original charter power of the Fleet Corporation or under the additional powers acquired by delegation from the President. Even if § 2 (c) has no application, because the contracts were not entered into pursuant to the power delegated by the President in 1917, it does not follow that the claims fall within the jurisdiction of the Comptroller General. For the Fleet Corporation is an entity distinct from the United States and from any of its departments or boards; and the audit and control of its financial transactions is, under the general rules of law and the administrative practice, committed to its own corporate officers except so far as control may be exerted by the Shipping Board. If, on the other hand, the contracts were made and cancelled by the Fleet Corporation under the power delegated by the President, the settlement and adjustment of the claim falls clearly within the powers conferred by § 2 (c) upon the Shipping Board.

There is nothing in the language of the statutes, or in reason, to support the suggestion that the Shipping Board has the power to adjust claims, but that the adjustment does not become operative unless there is approval of the final settlement by the Comptroller General. Nor is

there any basis for the further suggestion of Skinner & Eddy that the Shipping Board has power to make settlement, if it can; but where a settlement is not made and a suit by the United States is brought or threatened, the Comptroller General is the official to whom must be presented all claims for credit in such suit. It is true that the Merchant Marine Act did not modify § 951 of the Revised Statutes or impair the right of a defendant to a credit if sued by the United States upon a Fleet Corporation contract. Since the passage of the Merchant Marine Act, as before, the defendant may set up the credit, if he can show disallowance by the appropriate accounting officers. But § 951 does not prescribe who the appropriate officer is or that the claim must be presented to a general accounting officer of the Government. As was held in *United States* v. *Kimball,* 101 U. S. 726, the requirement of the section is satisfied when the claim is presented and disallowed by the officer who has power to allow the claim, although he is not a general accounting officer of the Government.

The Court of Appeals of the District based its judgment of affirmance solely upon the ground that, since the claims involved were already in the course of litigation in two suits in another federal court, no other court of coördinate jurisdiction could interfere. The Comptroller General had originally taken a somewhat similar ground for declining to act. But later he stated, in the trial court, that his answer should be taken as broadly denying his jurisdiction to consider claims of this nature. And, in this Court, he specifically disclaimed reliance upon the ground taken by the Court of Appeals. We have no occasion to consider its validity. Nor need we consider whether the refusal of the Comptroller General to take jurisdiction was a disallowance of the claim within the meaning of § 951 or any of the other questions which have been argued concerning the application of that section.                    *Affirmed.*