### UNITED STATES v. BETHLEHEM STEEL CORPORATION et al.

### BETHLEHEM SHIPBUILDING CORPORATION, LIMITED, v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION.

#### Nos. 3315, 11970.

District Court, E. D. Pennsylvania.
June 3, 1938.

J. Cullen Ganey, U. S. Atty., of Bethlehem, Pa., Max O'Rell Truitt, General Counsel, U. S. Maritime Commission, of St. Louis, Mo., and Paul D. Page, Jr., Ralph H. Hallett, Hardin B. Price, and Francis S. Walker, all of Washington, D. C., for the United States and the U. S. Shipping Board Emergency Fleet Corporation.

Evans, Bayard & Frick, of Philadelphia, Pa., and Frederick H. Wood and William W. Robison, both of New York City, for Bethlehem Shipbuilding Corp., Ltd., et al.

DICKINSON, District Judge.

There will be no charge made of undue haste in the disposition of these cases. The contract with which they concern themselves was signed in 1918. The Bill in Equity was filed to March Term 1925 and the actions at law are entitled as of December Term 1925.

The Master was appointed in 1931, and made his report in the sense of having

prepared it, February 19th, 1932, but withheld it at the request of the United States and agreement of the Steel Company, until the filing date of February 7th, 1936.

The cause was not set down for hearing upon the exceptions until May 16th, 1938. It is the due of the Master to state that no part of this "lapse of time" is chargeable to him but has been to him "a matter of regret and concern".

There are two cases before us, the other actions brought having been disposed of. Of the remaining cases one is a Bill in Equity and the other an action at law. The litigation began with the filing of the Bill. This was one to compel the defendant to disgorge averred unconscionable profits which it had received on a contract for the building of ships by the defendant for the United States Merchant Marine. This was promptly followed by the action at law in which the plaintiff seeks to recover from the Shipping Board Corporation a claimed unpaid balance due it for performance of the same contract. Each controversy is thus over the same contract and the proceeding and action may be discussed as one claim and defense. The threatened length of the inquiry induced the parties to agree upon a procedural arrangement to shorten it so far as possible. This was to have the proceeding in Equity referred to a Special Master and for the parties to the action at law to waive a jury trial and refer the cause to a Referee under the Pennsylvania practice—the same person to act as Special Master and also as Referee.

The then Owen J. Roberts, Esq. (now Mr. Justice Roberts of the Supreme Court), was appointed by the Court as Special Master and agreed upon as Referee. Upon the retirement of Mr. Roberts, William Clarke Mason, Esq., succeeded him, and it is his report which is before the Court with exceptions. He will be referred to as Special Master. 379 Requests for Findings of Facts and Conclusions of Law were submitted to the Master and answered by him. The Exceptions to his report number 153. A detailed discussion of all the points thus raised is impracticable within the limits of a judicial opinion nor is it necessary. The various contentions of the parties may be grouped and formulated in a few general questions.

The complaint and defense of the United States may be voiced in the statement that the contract in question called for the construction of 66 ships constructed at a total cost price of about $122,000,000, from which the contractor has received a profit of nearly $20,000,000, and is claiming the legal right to over $5,000,000 more, in addition to whatever profits its subsidiaries may have made on the supply of materials to the contractor. This (without the latter if any) makes up the portentous total of about $25,000,000. Even the part of it which the contractor has received is characterized by the United States as exorbitant, unconscionable and as the fruit of fraud, because of which the United States, as a defrauded party, is seeking to have restored to it the unjust sums exacted.

The answer and demand of the contractor is that it has asked and is asking for no more than the moneys due it under the contract entered into by the parties and that so far from what it has received being excessive that there is still an unpaid balance due it for the payment of which the action in assumpsit has been instituted. This brings the question before the Master and this Court to that of to how much has the contractor a right under the dealings and contract between the parties? It must be borne in mind that we are concerned with the legal justice of the cause and cannot, except so far as the law directs, give weight to other considerations.

Among the horrors of war a not inconsiderable one is the way and extent to which Army contractors profit by the needs of government. It may be that this in case of most contracts is necessarily true. Prices at such times are upset. Some one must take a real and great risk and a contractor cannot be expected to take it. It is proverbial that war profits from Government contracts are far beyond what in peace time would be deemed fair and reasonable.

It is pointed out by the United States that, in the instant case, the contractor had no reason to bargain for large profits to off-set a risk of loss because this contractor under this contract took no risk whatever. The exaction of inordinate profits is thus viewed by the United States as an advantage taken of the pressing needs of the Government. As war time is to other citizens a time of sacrifice, it seems unholy and sinful to make of the calamity of the people a source of inordi-

nate gain. As before stated, however, we are dealing with a matter of contract and not sentiment, patriotic or otherwise.

There have come into use three types of Government war time contracts, each designed for the protection of the Government but each proving to be to the advantage of the contractor. Perhaps the only remedy—aside from refraining from war—is to bear with the evil as uncontrollable. One is the flat sum price of peace time contracts. The risk of higher prices is always assumed by the Government, and if the higher prices are not paid by the contractor, they go into his profits. Another is the cost plus price. Theoretically this is just to both contractor and Government. In practice it however very much inflames the cost of performance of the contract and the general judgment pronounces it to fail of its purposes. A third is that made here, which is a cost plus contract with the added feature of giving to the contractor an inducement to hold down the cost to the lowest figure by giving him a percentage of any saving effected. The success of this type of contract in benefiting the Government depends upon the estimate of what the cost of construction should be. The United States avers that the contractor here fraudulently made this estimate so high as to make this part of the profit to the contractor inordinate.

The United States stands upon three propositions: One turns upon the interpretation given to the contract; the second upon a fact finding, and the third upon a conclusion of law. These three propositions are:

■ 1. The percentage of saving which the contractor is to receive is not based upon the difference between the estimated cost and the actual cost but upon that part of this difference which was due to the services rendered by the contractor.

It is not altogether clear whether the United States is relying upon this as a construction of the contract as made or whether upon the doctrine of unconscionable contracts, invoked in the third position of the Government, later discussed. As a method of treatment, we limit it at present to the proper interpretation of the contract. It need only to be said that the Master has not so construed the contract, and we are constrained by its wording to agree with the Master. The contract gives to the contractor one-half of the differ-

ence between the estimated cost and the actual cost of the ships. The Government's criticism of the contract is based upon this interpretation of its meaning.

■ 2. The estimated cost of construction, inserted in the contract as one basis for the determination of the bonus profit to the contractor, was fraudulently overstated by the contractor so as to make this part of the contractor's profits inordinately large and exorbitant.

This is a charge of actual fraud perpetrated by deception. The Master has found against this charge of actual fraud and under all the evidence he could not have found otherwise. The managers for the contractor adopted the famous Rob Roy distinction who admitted he was a robber but proudly proclaimed that he was no thief. The contractor boldly and openly fixed the figures in the estimated cost so high as to give them the promise of large bonus profits. The managers for the Fleet Corporation knew that the estimate was high and why it was made high and so protested it. The reply of the contractor's managers was, "We will take the contract with this promise of bonus profits incorporated in it but not otherwise. You take it or leave it". Whatever wrong there was in this may have been the wrong in a daylight robbery but there was no element of deception in it.

3. The contract, although without any element of fraudulent deception in its making, in its performance results in profits to the contractor, so inordinately large as to be extortionate and to render the contract unconscionable and thus unenforceable in equity or at law.

This is the real cause of action set up in the Bill and the real defense interposed to the action at law. As viewed by the Government, these profits are so large "that no one short of lunacy would agree to pay them and no honest man would accept them". The analogue is the enforcement of the contract of a drowning man to give an inordinately large reward to one who can without risk and with little trouble rescue him.

■ This presents the subject of the obligation of contracts and enforcement. This obligation has always been regarded as the very corner stone of the fabric of civilization. The whole business commercial structure is built upon it. It may well be thought that of late years we have

gone quite far enough toward abolishing the obligation of debt. There had always been however a limit to the binding force of a contract or at least the extent to which the law will go in enforcing it and this is the limitation which the United States invokes. When the results and consequences of the enforcement of a contract are such as to stagger our sense of what is just and fair, this alone may be deemed evidence of hidden fraud. Resort is had to various expedients to in effect avoid the contract. One is to a strict interpretation of the contract. The obligee may have his pound of flesh but not a tittle more or less and not a drop of blood. Sometimes a quantum meruit is substituted for that for which the contract calls. Sometimes a limit imposed by the arbitrary power of the law is placed upon what the obligee may exact, as in the case of our usury laws. Sometimes what is called a "policy of the law" is interposed to the enforcement of a particular contract. The law is powerless, in every case of contract, to prevent the unscrupulous from taking advantage of the unwary. All it can do is to weigh the need to observe and enforce the obligation of debt against the injustice and unfairness resulting from a particular contract. It cannot rewrite the contract between the parties. What really happens is this. The claimant has his contract but cannot enforce it without the aid of the law. The law simply refuses its aid to an unconscionable contract.

■ Applying these generalities to the case before us, there is presented the thought that the Government views this question as one affecting sovereignty. The sovereign needs no help from the Courts. It cannot be sued nor can a judgment against it be enforced without its consent. There would be nothing staggering in the proposition that the sovereign might interpose a quantum meruit limitation to any demand made upon him. This contract however was not made with the United States but with the Fleet Corporation. This Court ruled (per Thompson, J.) that the Fleet Corporation was a corporation, and that the legal consequences of this fact were not affected by the circumstance that the United States was an owner of its stock or indeed its sole owner. The United States Supreme Court has since so ruled. United States v. McCarl, 275 U.S. 1, 48 S.Ct. 12, 72 L.Ed. 131;

United States Shipping Board Merchant Fleet Corporation v. Harwood, 281 U.S. 519, 50 S.Ct. 372, 74 L.Ed. 1011.

■ We are in consequence dealing with a contract made between private parties. In viewing the "unconscionable profits" phase of it, there is this to be said. The motive for the insertion of the bonus feature is obvious. Unless the promise was of substantial profits, the incentive to keep down the cost would be lacking. Consequently it was made one-half of the total savings. It is doubtless true that there is no way of curbing "army contract" profits in time of war. What the Government is to be protected from is the higher war time cost. The direct way of measuring this is by the contrast of the actual war time cost with an estimate of what the peace time cost would have been. There would be many ways of checking up on this but such a contract would be difficult to frame. The bonus in this contract was measured by the contrast of an estimated war time cost with the actual cost. There is no way of checking up on such an estimate. It is almost altogether a guess. The only check would be to limit the maximum savings profit payable. The contractor here bluntly refused to enter into a contract with such a limitation. The strongest position for the Government to take is that an agreement to pay a savings bonus is an agreement to pay something for nothing.

The cost plus agreement here made was really a hiring of the contractor's equipment and organization on a ten per cent. commission basis. The contractor was really an employee of the Fleet Corporation. As such employee it was bound to render due service in keeping down the cost of construction to its employer. The exaction of a bonus for doing what it was the contractual duty of the employee to do and what it was otherwise paid for doing partakes of the nature of a racket. We are here applying the test of what is unconscionable. There is a recognized margin however between the service which an employee is in duty bound to render and that which he is capable of rendering. It is common practice to call forth this reserve energy of employees by offering the inducement of extra pay or a bonus for increased service by which the employer benefits. It is likewise common to measure the value of this extra service by results. A bonus given for time construc-

.tion is an illustration. Such agreements may be based upon a wrong principle but in view of a general and common practice they could not be condemned as unconscionable. For one party to a contract to take advantage of the ignorance or necessities of another may well be condemned as ethically wrong. Taking candy from a child is the acme of meanness. When a party should be relieved of the obligation of a contract because the other party to it has reaped an unexpected or undue profit, is to be determined by the circumstances of each individual case.

The Master has given to the consideration of this case painstaking care. He has supported his conclusions by reasons set forth in a Report of gratifying clarity and bearing every evidence of considerate judgment. We accept his conclusions as sound and adopt them.

■■■ This disposes of all the questions raised by the exceptions to this voluminous Report except those which relate to the question of the allowance of interest. The United States excepts to the allowance of any interest and the Steel Company to the allowance made as inadequate. We have been unable to find these specific exceptions other than 3 and 4 of the Steel Company. The question was however argued before us and we will assume that it is raised by appropriate exceptions. The question of interest allowance is commonly treated in the reported cases in a more or less perfunctory way. There seems to be a disposition to treat it as a matter of course by allowing interest. Controversy is commonly over the rate of allowance. Interest is however a matter of contract, express or implied, or is an element in the assessment of damages. Here the contract was to pay. a sum of money based upon a percentage of savings in the cost of the construction of these ships. There was no agreement to pay interest. The interest doctrine of the law of Pennsylvania in damage cases has been well stated by the Master. In tort cases it is not allowed qua interest but is allowable as an element in the assessment of the damages suffered by the plaintiff. The rate of allowance is not controlled by the usury Statutes except that what is commonly called the lawful rate cannot be exceeded. The reason for this limitation is obvious. In breach of contract cases what is really the like rule applies. Damages for the breach must be assessed. Deferred payment is an element.

■■■ We have in mind numerous cases, many of which have been cited to us, which rest upon a fiction. The fiction is that the damages became payable on the breach and there was then an implied promise to pay at once or to pay interest on deferred payments. Here there is no room for an implied promise. The promise was express to pay this bonus based upon a percentage of savings. Payment was not due until the saving was determined. This means here that the sum due does not bear interest until ascertained and hence not until judgment recovered. This in theory is no hardship to the contractor. He may press his claim promptly to judgment. He cannot turn it into an investment bearing, as is claimed here, six per cent. interest, thereby doubling the final payment to be made.

The Master was fully justified in assessing the damages, in considering the interest item at a two per cent. rate. By the same token he might have excluded it altogether, which we think he should have done. There is in the allowance of interest something in the nature of a penalty for delayed payment. We do not think any such penalty was incurred here.

It has been urged upon us that no interest should. be allowed because interest is not recoverable against the United States. We refuse to so hold but are in accord with the finding of the Master that the judgment to be entered is one against the Fleet Corporation.

To give definiteness of date to the decree and judgment to be entered none is now entered but leave is granted to enter a formal decree and judgment in accordance with this opinion and the conclusions stated below.

1. The Bill in Equity should be dismissed for want of Equity and the Cross-Bill for the additional reason of want of jurisdiction.

2. Judgment should be entered in the action at law of the Bethlehem Shipbuilding Corporation, Ltd. for the sum found by the Master without interest.

3. The other actions at law should be disposed of in accordance with the stipulations of the parties.

4. The Exceptions filed to the Report of the Master should be dismissed except

the exception, if any, to the interest allowance which should be sustained.

5. As thus modified, if there is such exception, the Report of the Master should be approved and confirmed.