**RECONSTRUCTION FINANCE CORP. v. CHROMIUM PRODUCTS CORP.**

**No. 13185.**

United States Court of Appeals
Ninth Circuit.

Feb. 17, 1953.

Rehearing Denied March 18, 1953.

Wm. Amory Underhill, Asst. Atty. Gen., John F. Cotter and Edmund B. Clark, Dept. of Justice, Washington, D. C., for appellant.

Fred L. Gibson, Livingston, Mont., Rockwood Brown, Horace S. Davis, William H. Bellingham and Ben N. Forbes, Billings, Mont., for appellee.

Before DENMAN, Chief Judge, and HEALY and POPE, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal from a judgment of the United States District Court for the District of Montana, awarding damages for breach of a leasing agreement of mining properties by Chromium Products Corporation, hereafter called Chromium, to Metals Reserve Company,[1] a corporation created under Section 5 of the Act of June 25, 1940, 54 Stat. 573. See 6 F.R. 2970. By that section appellant had been authorized "(2) When requested by the Federal Loan Administrator, with the approval of the President, to create * * * corporations, with power (a) to produce, acquire, and carry strategic and critical materials as defined by the President, * * *." Metals Reserve Company was created for the purpose of acquiring and carrying a reserve supply of such materials and all its stock was owned by appellant. It is not questioned that the chrome ore sought to be mined was a strategic and critical war material.

This Act of June 25, 1940, stated in its preamble that it is enacted "In order to aid the Government of the United States in its national-defense program". At that time Germany had invaded Norway. The Netherlands (after the aerial bombardment of Rotterdam) had surrendered as had Belgium. Italy had entered the war. The Germans had crossed the Marne and entered Paris and the Franco-German armistice negotiations had begun. The purpose of the legislation was to prepare for a likely second World War. So also was the lease with Chromium for its chromium ores, producing a metal essential to the hardening and rust-proofing of the steel used in munitions for all the Armed Forces.

The lease, as will be seen, was drawn by Metals Reserve Company as a separate entity from the government as sovereign, for it expressly provides for governmental action affecting its corporate performance. The compensation to Chromium is in royalties to be paid it on the chromium ore mined by Metals Reserve. It is agreed in paragraph 9 of the contract that "Beginning January 1, 1942, and thereafter during the term of this lease Lessee agrees to pay Lessor a minimum royalty of Thirty Thousand Dollars ($30,000) per year payable quarterly on or before thirty days after the end of each calendar quarter. In the event that the total royalties payable under Paragraph 4 hereof during any calendar year shall equal or exceed Thirty Thousand Dollars ($30,000) this minimum royalty obligation shall be fully complied with * * *."

Metals Reserve at any time on ninety days' notice to Chromium could terminate the lease upon payment of $1,000.00 and the royalty or minimum royalty then accrued. Metals Reserve also was to be relieved from payment of the minimum royalty during a period of suspended operations by a *specific provision* of paragraph 9 of the lease.

By these two provisions Metals Reserve could terminate the contract if it became apparent there was no further war need for

1. The properties, etc., of Metals Reserve Company were later transferred to the Reconstruction Finance Corporation (hereafter referred to as R.F.C.), a corporation wholly owned by the United States, by statute, Joint Resolution June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note. R.F.C. is the defendant in this action.

chromium ore, or it could stop mining but continue the lease without the payment of royalties and keep the mines in a condition to renew mining if a need again arose for the ores. As later seen, it was for the express purpose of being able to renew mining if the war needed it that the mining was suspended and the mines required to be kept in condition for such further operation.

The specific provision of paragraph 9 for suspending the mining operation is:

" * * * provided, however, should Lessee's construction or development or mining or milling operations or any other operation hereunder be *suspended* because of any of the causes or reasons set forth in Paragraph 29 hereof Lessee's obligation to pay a minimum royalty as aforesaid shall be suspended during any and all periods where such causes or reasons exist and the obligation to pay such minimum royalty shall be reduced in such proportion as the period of suspension ·of operations bears to the entire calendar year." (Emphasis supplied.)

The portion of paragraph 29 above referred to which is pertinent here is: "Anything in this Lease contained to the contrary notwithstanding, * * * *any requirement*, regulation, *restriction* or other act of *any* government * * * which is beyond the control of the lessee *or* which delays or interferes with the performance of this agreement, shall be considered sufficient justification for delay in such performance until such cause ceases to exist." (Emphasis supplied.)

Under this war expectant contract it is to be noted that it is *"any"* requirement or restriction of *"any"* government for which provision is made.

Chromium contends in effect that the words *"any* restriction" do not mean what they say, but that the *only* restriction applicable is one by a broad general regulation such as that in Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736, and in Jones v. United States, 1 Ct.Cl. 383. Neither of the cases consider a contract in which the government could impose "any" restriction. Applying the usual canons of

construction of contracts, we are required to give effect to the word "any" and not make it negatory by confining it to a single kind of restriction.

Chromium likewise contends in effect that the words "any government" do not mean what they say but that they exclude the Government of the United States. Here again the ordinary rule of construction requires us to give effect to the word "any" by including the Government of the United States.

Chromium also contends that the contract is not with Metals Reserve Company as a separate corporation, but directly with the United States because that corporation is an agency of the United States. This it contends although Chromium did not sue the United States but Metals Reserve's successor in interest, the Reconstruction Finance Corporation. Here again is applicable the rule that we must give effect and not make negatory the contract's carefully-drawn distinction between the provision of the corporate agreement to mine chromium and its provision that the government may "restrict" such action by the corporation. Under the contract Metals Reserve could not suspend operations by its corporate action. It could be done only by the government, an act beyond the corporate control of the lessee. The situation is that of the corporations in U. S. ex rel. Skinner & Eddy v. McCarl, 275 U.S. 1, 6 et seq., 48 S.Ct. 12, 72 L.Ed. 131; Reconstruction Finance Corp v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; Farm Security Administration v. Herren, 8 Cir., 165 F.2d 554. The case of Cherry Cotton Mills, Inc., v. United States, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835, dealt with a contract having no such provision.

The anticipated second World War began on December 7, 1941, before the first payment of the royalties became due on January 1, 1942. On February 24, 1942, the President transferred the control of the Metals Reserve Company to the Secretary of Commerce. Metals Reserve continued the operations under the lease and the payment of royalties until the performance of the agreement on December 31, 1943, was "restricted" as to mining operations but

the mines were kept in condition to renew mining by the Chairman of the War Production Board. Thereafter, the Metals Reserve Company refused to pay any royalty.

We regard this "restriction" of the corporation's operations as the sovereign's act, being one provided in the specific provision of the proviso of paragraph 9 invoking paragraph 29 of the lease, supra, for suspending mining when such action is by restriction by the government.

By the President's Executive Order No. 9024,[2] 7 F.R. 329, U.S.Code Cong.Service 1942, p. 49, Metals Reserve was required to comply with the plans, methods and procedure of the Chairman of the War Production Board. By a second Presidential Executive Order of January 24, 1942, No. 9040, U.S.Code Cong.Service 1942, p. 51,[3] the Chairman was authorized and chose to exercise his powers through H. G. Batcheller, operation's vice chairman of that Board.[4] Through Batcheller the Chairman finally determined the "plans, methods, and procedures in respect to * * * production", with which the Metals Reserve Company must comply, in an extended letter to the Secretary of Commerce then controlling that corporation.

The letter detailed the underlying facts and reasons for the Chairman's "plans and procedure" and then stated that "In view of the present stringent manpower situation and the lack of need for Montana concentrates as outlined above, we believe it *advisable to divert the men now employed in mining low grade chrome concentrates in Montana into the production of more critically needed materials such as copper and zinc. We, therefore request that you shut down all operations at the Benbow and Mouat-Sampson properties* except for such maintenance men as are necessary to keep both mines and mills in sufficiently good condition so that either or both operations could be revived in the event that the chromite picture should change for the worse." (Emphasis supplied.) It was pursuant to the requirement of this letter that the mining operations were suspended.

Such a Presidential restriction of the miners' operations so diverting them to the production of the "critically needed" war materials of copper and zinc is as much a governmental operation as a Presidential order that soldiers should be removed from one field of battle to another.

We think that the delay in the operations of the mine caused by the action of the government relieved the Metals Reserve Company from the liability for the minimum royalty. The judgment is reversed and judgment ordered entered that Chromium take nothing by its complaint.

POPE, Circuit Judge (dissenting).

The Government's corporation has interposed a specious defense which the majority have sustained by what seems to me to be an over-simplified treatment of the problem here, which is one of interpretation of a paragraph in this lease.

I know of no reason why the lessee, creature of the Government, might not stipulate in its contract that the minimum royalties bargained for shall cease to be paid whenever the Chairman of the War Production Board makes a "requirement" that such payments stop. But such an extraordinary, one-sided, and delusive arrangement should be found only when clear language to that effect has been used.

A fair reading of paragraph 29, and all of it,—not just a detached phrase thereof,—will disclose no intent to ignore or do away with the distinctions made in Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, in Jones v. United States, 1

2. "3. Federal departments, establishments, and agencies shall comply with the policies, plans, methods, and procedures in respect to war procurement and production as determined by the Chairman [of the War Production Board] * * *."

3. "The Chairman of the War Production Board may exercise the powers, authority, and discretion conferred upon him by this or any other Order through such officials or agencies and in such manner as he may determine; and his decisions shall be final." (Emphasis supplied.)

4. Since Congress gave the President the power to make such orders, the contention that Batcheller was acting merely as a "vice chairman" and not for the government, as a warring sovereign, is without merit.

Ct.Cl. 383, cited in the Horowitz case with approval, and in Ottinger v. United States, 88 F.Supp. 881, 116 Ct.Cl. 282.

None of those cases involved the construction of contract language such as that in paragraph 29. But what they all point out is that inherently, and in the nature of the case, there are two types of acts which the Government may do, or perform, after it, or one of its corporate agencies, has made a contract with private citizens. Thus the appropriate Government authority may enact or promulgate a rule or order, public and general in character, which is a manifestation of its sovereign power, which puts a stop to further performance of any such contract. On the other hand, the Government officer authorized to act for the Government, or to give orders to its corporate agent, may simply direct that there be no further performance of this particular contract by the Government or its agency, and thus bring performance to a stop.

The Horowitz case makes it plain that a stoppage on account of the former type of acts, those it describes as "its public and general acts as a sovereign" give rise to no liability. Such acts excuse performance by the Government of its contracts just as those same governmental acts furnish an excuse to a private obligor. Conversely, if the other type of act by a government agent brings about a stoppage of performance contracted for, there has been an actionable breach of contract.[1] As stated in the Ottinger case, supra: [116 Ct.Cl. 282, 88 F.Supp. 882] "If the contracts here in question had been between private parties, there would be no doubt that an interference by one of them with the performance by the other, comparable to the Government's alleged interference with the plaintiff's performance, would be a breach of contract." In Horowitz, the Supreme Court included in its quotation from the Jones case, the following: " 'The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one

character be made liable in damages for their acts done in the other. * * * In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court.' " The Ottinger case warns against confusing the two sorts of acts as follows: "* * * We think that to treat every act of a Government agent, done in the name of the Government, as an act of sovereignty within the meaning of the doctrine here under discussion would be a retreat, without reason, from the purpose of the statute permitting citizens to sue the United States for breach of contract."

Appellant contends the distinctions noted in these cases are not applicable here because this lease was executed by the corporate agency, not by the Government itself. That argument misses the point. What we must determine is what is an act of "any government or governments" as described in the lease. The man who gave the order to stop was, no doubt, on the public payroll, but the question remains, was he then acting in the sense of this language in paragraph 29, or was he merely functioning as an officer authorized to give directions for corporate action?

Those distinctions are verities in the light of which the lease here in question must be deemed to have been made. The parties to the contract must be taken to have had them in mind when the lease was drawn. And we must remember them as we read paragraph 29 and ask ourselves whether it bears any evidence that the parties to the lease used language intended to effect the most unusual result of requiring us "to treat every act of a government agent done in the name of the Government", as a defense, and not a breach of the contract. That paragraph reads, in full, as follows: "29. Anything in this Lease contained to the contrary notwithstanding, any strike, lockout, difference with workmen, accident, fire, explosion, flood, earthquake, embargo, mobilization, war, foreign war, hostility,

---

1. And, with particular reference to the situation here, if the agent in question is one authorized to give orders to a government corporation, and his order to stop performance is obeyed by this corporation, the latter has simply breached its contract.

riot, requirement, regulation, restriction or other act of *any government or governments,* whether legal or otherwise, acts of public enemies, the elements, force majeure, inability to secure or delay in securing cars, labor, raw materials, fuel or other supplies or material or electric power necessary for the operation of the leased premises or the operation of Lessee's facilities, failure of the ore supply or loss of the ore body in the said leased premises or inability to secure sufficient ore of the grade required for concentrating from the said leased premises, unforeseen metallurgical or milling delays, delays or interruptions in transportation by rail, water or otherwise, damage to or destruction of such mines or plants or other operating facilities and any other contingency, whether or not of the nature or character hereinbefore specifically enumerated, *which is beyond the control of Lessee* or which delays or interferes with the performance of this agreement, shall be considered sufficient justification for delay in such performance until such cause ceases to exist." (Emphasis supplied.)

This paragraph discloses nothing different from the sort of thing which would likely be inserted in any similar lease between private parties. Its reference is to the "requirement, regulation, restriction or other act of *any government or governments".* (Emphasis supplied). Clearly it refers as adequately to the State of Montana as to the United States. And it concludes its long list of excusing acts, beginning with "strike, lockout", and proceeding through "accident", "fire", "war", "acts of public enemies", "inability to secure * * * supplies * * * or electric power", with the statement "and any other contingency, whether or not of the nature or character hereinbefore specifically enumerated, *which is beyond the control of Lessee* or which delays or interferes with

the performance of this agreement. * * *"[2] (Emphasis supplied.)

Surely there is nothing here to warrant the bizarre result reached by the construction the majority opinion places upon this very common-looking paragraph. Such a construction is incongruous, for while I do not question the possibility of the Government, or one of its corporate agencies, stipulating that only the other party to one of its contracts shall be bound, and that the mere ipse dixit of some vice-chairman speaking for the public obligor, shall serve to release the latter, yet the likelihood of such being the intention seems highly improbable. The Government does not usually try to drive any such one-sided bargains with its citizens. I do not think it or its corporate creature intended to do so here.

The fact that when the Metals Reserve Company was created, and the lease was executed Rotterdam had been bombed, the Germans had entered Paris and the war in Europe was on, does not mean that the language of this lease can be construed otherwise than in accordance with the principles of general contract law, or differently than if it were one between individuals. In Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32, the contract construed was made almost a year after the date of this lease, and at a time when Pearl Harbor had been added to the warlike acts listed in the majority opinion. That contract was in aid of a program to assist the same nations under attack by the same Germans. The court there said, 332 U.S. at page 411, 68 S.Ct. at page 125: "It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law. United States v. Standard Rice Co., 323 U.S. 106, 111, 65 S.Ct. 145, 147, 89 L.Ed. 104, and cases cited. * * * We adhere to those

**2.** Not the least interesting thing about the majority opinion is that it has so abbreviated paragraph 29 as to make it appear to say: "any requirement, regulation, restriction or other act of any government", etc. It then charges appellee with arguing that the words "any restriction" do not mean what they say. If all the omitted words are inserted between the word "any" and the word "requirement", the effect is quite different. That is, the paragraph does not say "any requirement".

decisions and follow the same course here."[3]

Ever since Sir Edward Grey, a generation earlier, said "The lamps are now going out all over Europe", the world has been confronted with a series of crises, but, as the case just cited shows, the Government still enters into contracts whose meaning must still be determined by ordinary standards.[4]

Here the vice-chairman gave the direction that the Metals Reserve Company "shut down all operations at the Benbow and Mouat-Sampson properties". In type or kind of act this is no different than the act of a private corporation whose stockholders, pursuant to charter power, require the officers to cease performance of a contract.[4a] That the lease was made to aid the public purpose of prosecuting the second world war does not change this fact. Generally speaking, all contracts of the Government, or of these corporate agencies, are made in order to accomplish public purposes, and many of them for prosecution of war. But presumably the corporate agency's promise to perform means something, and a decision to quit performance is no more than an act

accomplishing a breach. This letter of the vice-chairman was simply an order to shut down this particular mine. It cannot be construed to be a "public and general [act] as a sovereign." The reference to *why* the order was given does not change its character. For one thing, the lessee no longer needed the ore, and said so.[5] The vice-chairman says that this will divert the employees to the copper and zinc mines. The majority opinion's effort to inflate this statement of an additional reason for a simple order that performance shall stop, into a "governmental operation" by allusions to " 'critically needed' war materials" and moving soldiers from "one field of battle to another" while it adds emotional content and patriotic flavor [6] to the opinon, cannot alter what was really the fact, namely, that the vice-chairman's order was but the initiation of a simple act of non-performance.

The excuses listed in paragraph 29 cannot fairly be construed to refer to that kind of act. The vice-chairman's order to stop has no resemblance to that sort of thing which under the common construction of such a clause, would be "beyond the control of the lessee".

3. Cf. S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 90 L.Ed. 851; Reading Steel Casting Co. v. U. S., 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907.

4. It has been suggested that Congress, under its power to make war, might acquire the sinews of war by conscription. See Lichter v. United States, 334 U.S. 742, 766, 68 S.Ct. 1294, 92 L.Ed. 1694. But neither Congress nor the Executive chose to take this mine in that way. Instead a contract of lease was made. In fact, the Renegotiation Act dealt with in the Lichter case, supra, which defines the Metals Reserve Company as a "Department" along with the departments of the Army and the Navy, expressly provides that its terms shall not apply to a lease such as that here involved. 50 Appendix, U.S.C.A. § 1191(i) (B).

4a. The opinion takes issue with appellee's argument that the contract, viewed realistically, was one with the United States, which acted through its agency, Metals Reserve Company. Cherry Cotton Mills, Inc., v. U. S., 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835, would appear to support

that view. As I see the matter, the position of the opinion that the contract was with Metals Reserve Company as a separate corporation makes even more clear the error into which the majority have fallen. Proceeding from this premise of theirs the next question is, was the decision to stop mining corporate action, or was it *governmental action?* The mere circumstance that the man who gave the order was on the public payroll did not make him any the less the human being who directed and ordered the specific action which was here taken, and which was definitely nothing but corporate action.

5. Obviously this was the real reason for the stop order, for if the ore were needed, stoppage would not have occurred.

6. The opinion's fustian references to the panoply and sounds of war, patently an afterthought, and wholly without meaning in the context of the opinion, might be excused if the majority were making the equally untenable argument that the paragraph's reference to "war, foreign war, hostility", furnished a defense here.

What the parties contemplated as coming within the language "requirement, regulation, restriction or other act of any government or governments" was action of a description which would furnish an excuse under a similar lease with a private lessee; —such for instance, as the Government's Limitation Order L. 208, issued October 8, 1942, suspending *all* gold mining. 7 F.R. 7992.[7]

There is other language in the lease which indicates that the purpose of paragraph 29 was not intended to give the Government, or its creature, any different type of excuse for nonperformance than the same paragraph would supply to a private lessee. Thus paragraph 17 permits the lessee, on ninety days notice to the lessor, and payment of $1000 to surrender and terminate the lease. This is a paragraph inserted for the exclusive benefit of the lessee.[8] Now if, as the majority opinion holds, the lessee, or its principal, the Government, may by a simple "requirement" issued by the appropriate official, suspend all further performance under the lease, of what earthly use is paragraph 17? No need to terminate what you do not need to perform. Just keep a firm hold upon the lease, keep the lessor out of possession and still bound, while you are not! All the vice-chairman need do is to pass a "requirement"! Almost as wonderful as "God" in "The Green Pastures" passing a miracle!

I cannot believe that the Government intended to drive any such sharp bargain with its citizens. And my reading of this contract proves to me that it has no language susceptible of a construction so unnatural as that put forward here.

7. This variety of action, which is referred to in the Horowitz case as governmental "public and general acts as a sovereign" would no doubt include also some orders directed to a single mine. Thus the State of Montana might, under a mine safety act, find the mine workings hazardous and order operations closed down. The substance of such an order would be: "Pursuant to our general rule that an unsafe mine shall not be operated we have found that your mine is hazardous and must be closed."

8. It reads as follows: "17. The Lessee may at any time, on ninety days notice to Lessor and by the payment to the Lessor of the sum of One Thousand Dollars ($1,000), surrender and terminate this Lease, provided that, promptly after such termination, Lessee shall pay all royalties, if any, accrued up to the effective date of such termination, any guaranteed minimum royalty payable to be prorated up to the date of such termination and no royalties shall accrue after the date of such termination."