William J. and Phyllis W. SAUDERS, (Landowner), C. Barry Marsh and Justin Marsh, (Landowner), Frank M. O'Brien, III (Landowner), Teresa Marsh Foxworth and Lewis Drew Marsh, (Landowner), Allen D. Fore, Bettye S. Marsha, (Landowner), Joe Easley, Personal Representative of the Estate of Alice V. Lucas, (Landowner), McLeod Furniture Company, Inc., (Landowner), Dorothy McLeod Rhodes and Helen M. Bradham, (Landowner), Darlington Veneer Company, Inc., (Landowner), Bu-

bendorff Brothers, Inc., (Landowner), Susan Sheppard, (Landowner), James M. Simons, (Landowner), Elizabeth Singleton Grayson, (Landowner), Eugene and Barbara Collins, (Landowner), Ralph Hoffman, (Landowner), Plaintiffs,

v.

SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, a/k/a Santee Cooper, Defendant and Third–Party Plaintiff,

v.

The UNITED STATES of America, Third–Party Defendant.

Civ. A. No. 2:93–3077–18.

United States District Court,
D. South Carolina,
Charleston Division.

June 29, 1994.

James Edward Bell, III, Sumter, SC, for plaintiffs.

John Hamilton Smith, John Douglas, Charleston, SC, for third-party defendant.

## ORDER

NORTON, District Judge.

This matter is before the court upon the United States of America's Motion to Dismiss the Third–Party Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).[1] A hearing was held on this matter on April 25, 1994.[2]

### I. BACKGROUND

Plaintiffs initiated this action against Santee Cooper in the Court of Common Pleas, Fifteenth Judicial Circuit of the State of South Carolina. Santee Cooper subsequently removed the action to Federal District Court. Once in this court, Santee Cooper filed a Third–Party Complaint against the United States seeking contribution and indemnification.

At the heart of this case is the Cooper River Rediversion Project (hereinafter "Rediversion Project") authorized by the River and Harbor Act of 1968. The precursor to the Rediversion Project was the original diversion, accomplished under a hydroelectric and navigation project known as the Santee Cooper Project. The Santee Cooper Project was constructed under a Federal Power Commission[3] license and commenced hydropower operation in 1942. The Santee Cooper Project included construction of the following: Wilson's Landing Dam and hydroplant on the Santee River,[4] which created Lake Marion as a reservoir; Pinopolis Dam and

---

**1.** Since the parties relied upon matters outside the pleading as to the proposed dismissal of the South Carolina Public Service Authority's (hereinafter "Santee Cooper") third-party tort claims and this court considered the same, the motion as to these claims will be considered a motion for summary judgment pursuant to Fed.R.Civ.P. 56. *See infra* p. 8.

**2.** Santee Cooper's Motions to Dismiss and for a More Definite Statement were also argued at the hearing on April 25, 1994. The court orally

denied Santee Cooper's Motion to Dismiss and granted in part its Motion for a More Definite Statement.

**3.** This commission is now the Federal Energy Regulatory Commission.

**4.** The Santee River empties into the Atlantic Ocean just south of Georgetown Harbor, South Carolina.

hydroplant on the Cooper River,[5] which created Lake Moultrie as a reservoir; and a diversion canal connecting Lake Marion to Lake Moultrie.

The net result of the Santee Cooper Project was to divert virtually all of the water from the Santee River, through Lake Marion and the diversion canal into Lake Moultrie, and then into the Cooper River, which flows into Charleston Harbor. Because the Pinopolis Dam was the principal hydropower facility (to take advantage of the combined Santee and Cooper River flows) and because of a restriction in Santee Cooper's Federal Power Commission license, the Wilson's Landing Dam and hydroplant typically discharged only 500 cubic feet per second (hereinafter "cfs") continuous flow into the Santee River, plus any flood flows in excess of the storage capacities of Lakes Marion and Moultrie. Prior to 1942, the average flow of the Cooper River at Pinopolis was only 72 cfs; after 1942, the average flow increased to 15,000 cfs with a maximum possible flow of approximately 27,500 cfs.

As a result, beginning in 1942, a phenomenal increase occurred in the rate of shoaling in Charleston Harbor which magnified dredging requirements and costs and strained the capacity of spoil disposal areas. The Santee Cooper Project was determined to bear eighty-five (85%) percent of the responsibility for the shoaling within Charleston Harbor. The diversion of the Santee River into the Cooper resulted in an increased freshwater discharge, which in turn carried increased sediment loads, caused greater erosion of the Cooper River channel and caused the formation of currents which prevented bottom sediments from being washed out to sea.

The solution to this problem was the Rediversion Project. The Rediversion Project included a rediversion canal to connect Lake Moultrie to the Santee River with a new hydroplant constructed midway (at St. Stephen) on the canal. The discharge through the Pinopolis hydroplant would be limited to an average of 3,000 cfs, reducing the flow of

fresh water along with the attendant erosion and sedimentation into Charleston Harbor through the Cooper River. The reduced flow would also eliminate density currents trapping sediments in the harbor. Santee Cooper would be entitled to the power produced from the St. Stephen Hydroplant. The Secretary of the Army was authorized by Congress to negotiate with Santee Cooper to establish the details concerning the limitation of releases from Pinopolis to the Cooper River.

The negotiation between the Secretary and Santee Cooper resulted in Contract DACW60–77–C–0005 and Supplemental Agreements One through Four between the United States Department of the Army and Santee Cooper (hereinafter "Rediversion Contract"). Under section 1 of the Rediversion Contract, the government agreed to construct the Rediversion Project. Rediversion Contract, §§ 1.1, 1.7 and 1.12. The government also agreed to operate and maintain the Rediversion Project, *Id.* at § 1.2, for a fifty (50) year period, at which time title would pass to Santee Cooper, *Id.* at § 1.3. Santee Cooper's operation of the Rediversion Project is confined to maintaining and operating the cooling water system, *Id.* at § 2.9, and controlling the activation of St. Stephen by remote control, *Id.* at § 2.11.[6]

The central purpose of the Rediversion Contract is to limit releases into the Cooper River. Section 2.1 of the Rediversion Contract limits the release of water at Pinopolis (a/k/a Jefferies) to an average daily flow of 3,000 cfs with greater flows contingent upon a determination by the government that they are in the public interest. *Id.* at § 2.1; *see also,* § 1.4. Section 12 of the Rediversion Contract, entitled "Interference," provides, in part:

It is further understood that, in order to realize the benefits to be derived from the [Rediversion] Project, flows from Jefferies [Pinopolis] must be permanently reduced in accordance with Section 2.

---

**5.** The Cooper River empties into the Atlantic Ocean through Charleston Harbor, South Carolina.

**6.** The obligations of Santee Cooper are set forth in full in section 2 of the Rediversion Contract.

*Id.* at § 12. By Letter of Agreement in December of 1985, the average discharge through Jefferies/Pinopolis and into the Cooper River was increased to 4,500 cfs. Santee Cooper and Corps of Engineers Cooper River Rediversion Project Letter of Agreement, p. 1 (para. A).

Plaintiffs, a group of landowners whose property is situated in the Santee River Basin below the Tailrace Canal of the Rediversion Project, allege claims of negligence, trespass and inverse condemnation against Santee Cooper. The Complaint alleges that Santee Cooper has the sole authority to determine the volume and rate of releases through the rediversion canal, Complaint, para. 15 & 18, and also that Santee Cooper has the sole authority to determine the volume and rate of release through the Jefferies (Pinopolis) facility. *Id.* at para. 15. The Complaint further contends that because of the restriction of releases through Jefferies (Pinopolis) into the Cooper River, excessive flows have been released into the Santee River far exceeding its banks, causing flood events in 1987, 1990, 1991, 1992 and 1993. *Id.* at para. 21–23. Finally, the Complaint contends that the flooding has drastically reduced the value of forest and agricultural resources, damaged wildlife habitat, and impaired adjacent hunting and fishing rights, generally rendering the property useless. *Id.* at para. 25.

Santee Cooper's Third–Party Complaint against the United States attempts to hold the United States liable for Plaintiffs' claims by asserting third-party claims for indemnity, contribution and negligence. The indemnity claim is based upon the provision in Section 9 of the Rediversion Contract which states:

> During the period the Government holds and retains title to the [Rediversion] Project, the Government shall assume the risk of all claims arising from the construction and operation of said [Rediversion] Project (including claims arising out of the discharges provided for in paragraphs 2.1 and 2.2), except those arising from the fault or negligence of ... [Santee Cooper] or from

failure to release water or operate the Project in accordance with Section 2.

Rediversion Contract, § 9.1.

The United States is presently before the court upon its Motion to Dismiss the Third–Party Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The United States contends that all of Santee Cooper's claims which sound in tort are barred by the discretionary function exception to the Federal Tort Claims Act (28 U.S.C. § 2680(a)) and its other claims are exclusively within the jurisdiction of the Court of Federal Claims (28 U.S.C. §§ 1346(a)(2) & 1491(a)(1)).

## II. STANDARDS

### A. Motion To Dismiss Standard—Lack of Subject Matter Jurisdiction

The United States moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) based upon a lack of subject matter jurisdiction and a failure to state a claim upon which relief could be granted. Specifically, the United States moves to dismiss Santee Cooper's third-party indemnification claim for a lack of subject matter jurisdiction.

The party asserting jurisdiction has the burden of proving that jurisdiction. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 181–82, 56 S.Ct. 780, 782, 80 L.Ed. 1135 (1936). The court must determine if plaintiffs have sufficiently alleged a basis of subject matter jurisdiction. The factual allegations of the complaint are taken as true. *Adams v. Bain,* 697 F.2d 1213, 1216 (4th Cir.1982).

### B. Motion for Summary Judgment Standard

The parties presented matters outside the pleading with respect to the proposed dismissal of Santee Cooper's third-party tort claims. These matters were considered by this court. If "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." Fed.R.Civ.P. 12(b). Accordingly, since matters outside the pleading were presented to and considered by the court, the United States' motion with respect to the proposed dismissal of

Santee Cooper's third-party tort claims shall be treated as one for summary judgment.

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact...." Fed. R.Civ.P. 56(c). In evaluating a motion for summary judgment, this court must view the record in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990). The judge is not to weigh the evidence himself but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

> The non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' [Cite omitted]. 'The mere existence of a scintilla of evidence in support of [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [the non-moving party].' [Cite omitted].

*Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) ("Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes"). However, "[w]here states of mind are decisive as elements of a claim or defense, summary judg-

ment ordinarily will not lie." *Overstreet v. Kentucky Central Life Ins. Co.,* 950 F.2d 931 (4th Cir.1991).

## III. ANALYSIS

### A. Discretionary Function Exception

In suits against the United States government, this court lacks jurisdiction unless sovereign immunity is waived. *See generally Lynch v. United States,* 292 U.S. 571, 579–84, 54 S.Ct. 840, 844–45, 78 L.Ed. 1434 (1934); *Murray v. United States,* 520 F.Supp. 1207, 1209 (D.N.D.1981), *aff'd,* 686 F.2d 1320 (8th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). The Federal Tort Claims Act (hereinafter "FTCA") waives federal sovereign immunity for claims grounded in tort. *United States v. Yellow Cab Company,* 340 U.S. 543, 545–47, 71 S.Ct. 399, 402, 95 L.Ed. 523 (1951).

Specifically, the FTCA confers exclusive jurisdiction upon district courts over civil actions for money damages caused by the negligent or wrongful act or omission of any employee of the government acting within the scope of his or her employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). This grant of subject matter jurisdiction is, however, tempered by a rather extensive list of exceptions found at 28 U.S.C. § 2680. If any of these exceptions apply, courts lack subject matter jurisdiction since sovereign immunity has not been waived.

The case at bar involves "one of the more important, and certainly one of the most often-contested, exceptions, the discretionary function exception"[7] of 28 U.S.C. § 2680. Section 2680 provides in pertinent part:

> The provisions of this chapter and section 1346(b) of this title shall not apply to:
> (a) Any claim ... **based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Govern-**

---

7. *Baum v. United States,* 986 F.2d 716, 719 (4th Cir.1993).

ment, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added).

Although lengthy, the court thinks it is instructive to quote from the recent Fourth Circuit opinion in *Baum* regarding the purposes of the discretionary function exception:

> The discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.' The Supreme Court has further identified the purpose of the exception as follows:
>
> > Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took 'steps to protect the Government from liability that would seriously handicap efficient government operations.'
>
> Though the purpose underlying the discretionary function exception is well accepted, courts have encountered some difficulty in applying its rather general terms to the myriad of fact patterns that predictably present themselves as litigants attempt to measure governmental conduct by the measuring stick of state tort law. The statute itself makes no attempt to define what governmental functions are to be deemed discretionary and thus outside the scope of the waiver. Moreover, until recently the Supreme Court, as well as this court, found it unnecessary to define with precision when the discretion ends in deciding questions involving the exception.

986 F.2d at 719–20 (citations omitted).

■ The law defining what governmental functions are discretionary for purposes of the exception has been stated in the form of a two-tier analysis:

[T]he discretionary function exception applies when (1) the relevant conduct involves an element of judgment or choice on the part of the Government actor and (2) the conduct involves considerations of public policy.

*Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 970 (4th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992) (citing *Berkovitz v. United States,* 486 U.S. 531, 534–38, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988)).

### 1. First Tier: Element of Judgment or Choice

Again, the Fourth Circuit in *Baum* thoroughly discussed the inquiries involved in the two-tier analysis quoted above, and this court finds it instructive to quote from that opinion:

> When evaluating a claim under the FTCA, we must ask first whether the governmental action complained of 'involves an element of judgment or choice.' The inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action. If such a mandatory statute, regulation, or policy applies, then the conduct involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary.[8] In that case the government actor 'has no rightful option but to adhere to the directive,' and if the plaintiff can show that the actor in fact failed to so adhere to a mandatory standard, then the claim does not fall within the discretionary function exception.

986 F.2d at 720 (citations omitted) (footnote added).

This court finds that the decision of the United States whether or not to allow greater flows through the Rediversionary canals is a discretionary act. Section 2.1(2) of the Rediversion Contract provides that the decision whether or not to allow such flows is based upon a determination of the public

---

8. *See, e.g., In re Sabin Oral Polio Vaccine Products Liability Litigation,* 984 F.2d 124 (4th Cir. 1993) (action not barred by the discretionary function exception where approval of vaccine violated specifically prescribed safety directives that left no room for choice.)

interest.[9] Determining the amount of water to be released from a project is a discretionary decision. It has been held that decisions concerning when to store and when to release water from a reservoir operated for flood control and navigation purposes require the use of discretion. *Spillway Marina, Inc. v. United States,* 445 F.2d 876, 878 (10th Cir.1971). Likewise, when the United States changes the flow, current, channel, banks and course of the Missouri River through a navigation project, *Coates v. United States,* 181 F.2d 816 (8th Cir.1950), or raises the water level behind a flood control dam, *Konecny v. United States,* 388 F.2d 59 (8th Cir.1967), courts have held that it is performing a discretionary function. In fact,

> [i]t would be difficult if not impossible to point to any example of exercising and performing discretionary functions and duties on the part of federal agencies more clearly within the [discretionary function] exception of the Federal Tort Claims Act....

*Id.* at 62 (quoting *Coates,* 181 F.2d at 817).

Moreover, decisions by a federal agency as to how to implement a project submitted to and approved by Congress are discretionary in nature. *California v. United States,* 146 F.Supp. 341, 344 (S.D.Cal.1956); *Thomas v. United States,* 81 F.Supp. 881, 882 (W.D.Mo. 1949). The need to restrict releases into the Cooper River to reduce the shoaling in Charleston Harbor was at the forefront of Congressional approval for the Rediversion Project. *See, e.g.,* Senate Document No. 88, p. viii, 7, 9, 28–30, 45, 51, 55, 57 & 63–64 (The shoaling and navigation purposes of the Santee Cooper Rediversion Project appear throughout Senate Document No. 88.). Accordingly, the United States' discretion

whether to agree to additional releases was expressly preserved. Santee Cooper recognized at the time Congress approved the Rediversion Project that it was bound to the set discharge "unless the Corps should agree to a higher flow." *Id.* at 63–64. Section 2.1 of the Rediversion Contract restricts Santee Cooper to the set discharge, from which it can be released only "if the Government should agree" to greater flows. Thus, the United States has no obligation to Santee Cooper to agree to increased releases into the Cooper River.

Based on the above, this court finds that the first tier of the discretionary function exception is met. A discussion of the second tier follows.

### 2. Second Tier: Public Policy Considerations

"If no such mandatory statute, regulation, or policy applies to remove the challenged conduct from the choice and judgment of the government, then we move to the second tier of the ... [discretionary function exception] analysis and ask whether the choice or judgment involved is one 'based on considerations of public policy.'" *Baum,* 986 F.2d at 720 (citation omitted). Regarding the second tier, the Fourth Circuit has stated the following instructive language, *albeit* lengthy:

> This requirement is consistent with and mandated by the general purpose underlying the FTCA and the discretionary function exception, i.e., to balance Congress' desire to allow redress of injuries suffered through the negligence of government actors against the need to protect the government from being hobbled in the discharge of its policy-driven duties by tort suits. In [*United States v.*] *Gaubert,* [499

---

**9.** Section 2.1(2) states:

> 2.1 Release from Jefferies during each week (defined as the period from the beginning of Saturday to the end of Friday) an average discharge of 3,000 cfs, plus or minus five (5) percent as a permitted operational variance, but not to exceed during any day (defined as midnight to midnight) an average of 5,000 cfs, plus five (5) percent as a permitted operational variance, EXCEPT:
>
>      \*    \*    \*    \*    \*    \*
>
> (2) If the Government should agree either to temporary lower flows due to limited availabil-

ity of water, or to greater flows. **The Authority will also release temporary greater flows when such flows are determined by the Government to be in the public interest.** Discharge shall be determined from either flow meters or from calculated values based on a mutually acceptable method.

Rediversion Contract, § 2.1(2) (emphasis added).

U.S. 315, 324–25 n. 7, 111 S.Ct. 1267, 1275 n. 7, 113 L.Ed.2d 335 (1991),] the Court provided an illustration of the operation of this requirement that we think particularly helpful in its application:

There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

Finally, we note one further point with respect to the application of the second element of the foregoing analysis that we believe *Gaubert* clarified. Rather than requiring a fact-based inquiry into the circumstances surrounding the government actor's exercise of a particular discretionary function, we are of opinion that a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy. To quote the Court:

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature

of the actions taken and on whether they are susceptible to policy analysis.

*Gaubert,* ... 499 U.S. at 324, 111 S.Ct. at 1274–75.

Consistent with the objective approach to evaluation of whether a particular discretionary act is grounded in policy considerations is the well-established presumption that public officials have properly discharged their official duties. Under this presumption and the teaching of *Gaubert,* we will not assume that government agents, in undertaking actions of the type normally thought to involve policy choices, in a particular case acted arbitrarily or on whim, disregarding those essential policy questions. Thus, our inquiry here must focus on the inherent, objective nature of the challenged decision; we find largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment.

*Baum,* 986 F.2d at 720–21 (citations omitted).

Therefore, the "public policy" inquiry, the second prong of the discretionary exception test, is not whether a particular actor actually balanced social, economic or political considerations but whether the conduct is "susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* Because the inquiry concerns the nature of the conduct and not an investigation into the subjective decision-making process, the discretionary function exception applies even in the absence of a conscious policy decision, provided the decisional area is one susceptible to policy analysis. *See Blakey v. U.S.S. Iowa,* 991 F.2d 148, 153 (4th Cir.1993) (Navy's actions or inactions were a matter of choice and discretion and presumed to involve policy considerations). Nevertheless, it is instructive to consider a certificate of the current District Engineer for the Charleston District, submitted by the United States, as to some of the issues he would have to con-

sider in making a decision on a request from Santee Cooper for the release of additional water. Included in his non-exhaustive list are the effects on navigation (as it affects both commercial shipping and national defense), hydropower production, fish and wildlife resources, water quality and economic development. These same considerations are included in the discussion of concerns expressed to Congress in Senate Document No. 88 before the Rediversion Project was authorized. *See* Senate Document No. 88, p. xi, 1–2, 6–7, 20–30, 45, 55 and 57 (regarding navigation concerns); ix, xii–xiii, xxxiv–xxxv, 1–2, 12, 16–17, 45–50 and 57 (regarding hydropower); xi–xiv, xvi–xvii, 2–3, 7, 10–11, 42, 45 and 58 (regarding fish and wildlife resources), xviii–xx, 17–18, 26 and 31–32 (regarding water quality); and ix, 6, 15 and 55 (regarding economic development). While Senate Document No. 88 is a report that was prepared by the Chief of Engineers at the request of Congress, it was adopted as the will of the Congress when Congress approved construction of the project "in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in [Senate Document No. 88]." Pub.L. No. 90–483, 82 Stat. 731, 1968 U.S.C.C.A.N. 840, 840–41.

### 3. Santee Cooper's Objections To Application of the Discretionary Function Exception

Santee Cooper objects to application of the discretionary function exception to this case in two ways: (1) the United States failed to consider flooding as required by Congress in the implementing act for the Rediversion Project; and (2) the decisions not to allow increased flows down the Cooper River are not the kind of decisions that are protected by the discretionary function exception.

This court agrees with the United States that the Rediversion Project is not a flood control project. While it is true, as Santee Cooper points out, that the authorization act for the Rediversion Project mentions "flood control" in the introductory paragraph to Section 101 of Pub.L. 90–483, it is evident, as seen below, that phrase has no relation to the Rediversion Project. Beyond this, Santee Cooper provides no further authority for the Rediversion Project being a flood control project.

Pub.L. 90–483 is divided into three sections: "TITLE I—RIVERS AND HARBORS," "TITLE II—FLOOD CONTROL," and "TITLE III—RIVER BASIN MONETARY AUTHORIZATIONS." The introductory paragraph of Section 101 of TITLE I is the source of the language in question. Section 101 begins: "That the following works of improvement of rivers and harbors and other waterways for navigation, flood control, and other purposes are hereby adopted and authorized...." Following this introductory paragraph are two listings of projects, the first one labeled "NAVIGATION" and the second "BEACH EROSION." The Cooper River Rediversion Project is included under "NAVIGATION." Balanced against Congress' elliptical use of the term "flood control" in a laundry list of possible purposes in the introductory paragraph of Section 101 is the specific reference there to the projects being adopted and authorized "in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the respective reports hereinafter designated." [10] The report designated for the Rediversion Project is Senate Document No. 88. The purposes and functions of the Rediversion Project are reviewed in the 92 pages of Senate Document No. 88 in relentless detail. As the United States points out, no where is flood control mentioned as being implicated in the project purpose, and it is made quite clear that the project is purely to aid navigation on the Cooper River and in the interest of silt con-

---

**10.** Section 101 of Title 1 also states that "[t]he provisions of section 1 of the River and Harbor Act ... shall govern with respect to projects authorized in this title; and the procedures therein set forth with respect to plans, proposals, or reports **for works of improvement for navigation** *or* **flood control** ... shall apply as if herein set forth in full." (emphasis added). The em-

phasized language indicates that a project could be either for navigation *or* flood control. As seen below, the court finds, in accordance with the stated purposes in Senate Document No. 88, that the Cooper River Rediversion Project was created to improve navigation and silt control in the Cooper River and Charleston Harbor.

trol for Charleston harbor. The court finds that Santee Cooper is not a flood control project.[11]

Santee Cooper further contends that the District Engineer's decisions regarding the allowance of increased flows are not the kind of decisions the discretionary function exception is designed to protect, apparently because there are no implementing regulations regarding the District Engineer's decision process. The contract between Santee Cooper and the United States provides that the District Engineer will make his decision based upon considerations of the "public interest."[12] A determination of the "public interest" in these situations obviously calls for an exercise of discretion in the manner contemplated by the discretionary function exception to the FTCA. Furthermore, the implication of the public interest in these decisions is clear to this court even without the contractual provision, § 2.1. The court finds that the discretionary function exception applies to this case and thus Santee Cooper's tort based claims are not within the jurisdiction of this court. Summary judgment in favor of the United States is therefore proper.

## B. The Contract Claim

■ In its second cause of action, Santee Cooper contends that it is entitled to indemnification from the United States for any amounts it has to pay Plaintiffs due to the provisions of its contract with the United States. The United States argues that because this claim clearly exceeds ten thousand dollars, the Court of Federal Claims has exclusive jurisdiction. *Hahn v. United States,* 757 F.2d 581, 585–86 (3d Cir.1985); *Stone v. United States,* 683 F.2d 449, 452 (D.C.Cir.1982). In Santee Cooper's second cause of action it seeks indemnification based upon section 9.1 of the Rediversion Contract:

During the period the Government holds and retains title to the Project, the Government shall assume the risk of all claims arising from the construction and operation of said Project (including claims arising out of the discharges provided for in paragraphs 2.1 and 2.2), except those arising from the fault or negligence of the Authority or from failure to release water or operate the Project in accordance with Section 2.

Rediversion Contract, § 9.1. Actions for money damages based upon indemnity agreements are within the jurisdiction of the Court of Federal Claims. *Jeppesen Sanderson, Inc. v. United States,* 19 Cl.Ct. 233 (1990).

■ In response, Santee Cooper argues that its contract claims are within the jurisdiction of this court based upon considerations of judicial economy and upon its contention that the Honorable Sol Blatt, Junior has previously rendered judgment on the meaning of the contractual provision in question. As to the first objection, judicial considerations of economy do not permit the litigation of cases in courts that have no jurisdiction over them. As to the second objection, Santee Cooper's restatement of Judge Blatt's ruling is incorrect. In the order in *South Carolina Public Serv. Auth. v. United States Department of the Army,* Civil Action No. 2:89–0302–8 (June 8, 1990) (unpublished order), Judge Blatt did not rule on the contract language; rather, he realized that to do so was beyond the district court's jurisdiction. Judge Blatt stated:

The magistrate found that the Claims Court, and not the District Court, has jurisdiction over any issue related to the contract between the Army and Santee Cooper. No objection was made by the parties to this finding and it is now the law of this case.

*Id.* at 6 n. 2. What Judge Blatt actually decided in the above cited declaratory judg-

---

**11.** If the Rediversion Project were a flood control project, then the court would have to consider the United States' argument that it would be immune from suit pursuant to the provision of 33 U.S.C. § 702c which states: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place...."

**12.** The contract in question explicitly states that Santee Cooper "will also release temporary greater flows when such flows are determined by the Government to be in the public interest." Rediversion Contract, § 2.1.

ment action was that the implementing statute gave the Army sufficient authority to enter into a contract to indemnify Santee Cooper with regard to the Rediversion Project. Judge Blatt's analysis did not touch upon the meaning of the terms in the contract between Santee Cooper and the United States. For this court to indulge in actually litigating the United States' monetary obligations under the contract would be plainly beyond its jurisdiction.

Based on the above, Santee Cooper's second cause of action is found to be within the exclusive jurisdiction of the Court of Federal Claims and must be dismissed.

### IV. CONCLUSION

Santee Cooper's claims which sound in tort are barred by the discretionary function exception to the FTCA and its claim for indemnification is within the exclusive jurisdiction of the Court of Federal Claims. It is therefore,

**ORDERED,** that the United States' Motion for Summary Judgment as to Santee Cooper's third-party tort claims be **GRANTED.** It is further

**ORDERED,** that the United States' Motion to Dismiss as to Santee Cooper's third-party indemnification claim be **GRANTED.**

**AND IT IS SO ORDERED.**