UNITED STATES of America, Plaintiff,

v.

IRON MOUNTAIN MINES, INC.,
et al., Defendants.

STATE OF CALIFORNIA, Plaintiff,

v.

IRON MOUNTAIN MINES, INC.,
et al., Defendants.

And Related Cross–, Counter–,
and Third–Party Claims.

No. Civ–S–91–768 DFL JFM.

United States District Court,
E.D. California.

Oct. 28, 1997.

Paul B. Galvani, Ropes and Gray, Boston, MA, for Rhône–Poulenc Inc.

Thomas H. Hannigan Jr., Ropes and Gray, Boston, MA, for Rhône–Poulenc Basic Chemicals Co.

James W. Matthews, Ropes and Gray, Boston, MA, for Rhône–Poulenc Inc.

Michael Brian Hingerty, Thomas Bloomfield, U.S. Environmental Protection Agency, Regional Counsel, San Francisco, CA, for U.S.

David B Glazer, U.S. Dept. of Justice, Environmental & Natural Resources Div., Environmental Enforcement Section, San Francisco, CA, (Counsel for United States, plaintiff).

Yoshinori H.T. Himel, U.S. Atty., Sacramento, CA, for U.S.

Martin F. McDermott, Mark A. Rigau, David L. Weigert, U.S. Dept. of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, for U.S.

Thomas G. Redmon, Wilke Fleury Hoffelt Gould and Birney, Sacramento, CA, for Rhône–Poulenc Basic Chemicals Co.

Margarita Padilla, California State Attorney General, Oakland, CA, for State of Cal.

Sara J. Russell, Attorney General's Office of the State of California, Oakland, CA, for State of Cal.

### MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

This is a CERCLA cost recovery action concerning Iron Mountain Mine, a copper, zinc, and pyrite mine located in Northern California.[1] For over a decade, the Environmental Protection Agency ("EPA") has been studying Iron Mountain Mine to determine how best to remediate the acid mine drainage—referred to as "AMD"—that is created at the Mine when rain and groundwater react with exposed sulfide deposits. The AMD from Iron Mountain Mine is viewed by the EPA as a particular threat to the nearby Sacramento River. The AMD from Iron Mountain Mine runs into Boulder Creek and Slickrock Creek, both of which flow into Spring Creek. Spring Creek terminates in the Spring Creek Reservoir formed by the Spring Creek Debris Dam. The Spring Creek Debris Dam is located just to the west of an arm of the Keswick Reservoir. Water from Spring Creek flows into the Keswick Reservoir where it mixes with the water of three great rivers—the Sacramento, McCloud, and Pit Rivers—contained behind the Shasta Dam. In this way, AMD-tainted water makes its way from the Spring Creek Reservoir into the Keswick Reservoir from whence the Sacramento giver continues its journey to the San Francisco Bay.

Rhône–Poulenc is the successor of the Mountain Copper Company, Ltd., which mined Iron Mountain from 1896 until after World War II. The Mine is now inactive. Rhône–Poulenc has borne much of the expense of the EPA's cleanup efforts at the Mine. However, in various counterclaims, Rhône–Poulenc contends that the United States is also liable for some or all of the response costs associated with the release of AMD from the Mine.[2]

In this motion, Rhône–Poulenc advances three reasons for the somewhat surprising proposition that the United States should be held liable for the AMD created by Mountain Copper's fracturing of Iron Mountain. First, Rhône–Poulenc argues that the United States should bear its portion of the response costs because of the United States' construction, ownership, and operation of Central Valley Project facilities in the West Shasta Mining District ("CVP facilities") where Iron Mountain Mine is located. In the 1930's, Congress authorized the construction of the Central Valley Project, a vast water project consisting of twenty dams and reservoirs, eight powerplants, and approximately 500 miles of canals and aqueducts located throughout California's Central Valley Basin. All of these facilities are owned by the United States and are operated by the United States Bureau of Reclamation.[3] Rhône–Poulenc identifies three CVP facilities along the Sacramento River, which it alleges have contributed and continue to contribute to the environmental contamination around Iron Mountain Mine. Those facilities are the Shasta Dam and Lake; the Keswick Dam and Reservoir; and the Spring Creek Debris Dam, Reservoir, and Power Plant.[4]

Rhône–Poulenc's CVP facilities counterclaim rests on the notion that Iron Mountain

---

**1.** The Comprehensive Environmental Response, Compensation, and Liability Act, known as CERCLA, 42 U.S.C. § 9601 et seq., authorizes the President to respond to releases of hazardous substances by undertaking the cleanup or ordering responsible parties to do so. 42 U.S.C. § 9604(a). The government may seek its response costs from liable parties under 42 U.S.C. § 9607.

**2.** Rhône–Poulenc brings its counterclaims under 42 U.S.C. §§ 9607(a) and 9613(f). These sections of CERCLA provide a potentially responsible party, such as Rhône–Poulenc, with a claim for contribution against a second potentially re-

sponsible party. *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1301 (9th Cir. 1997).

**3.** The purposes underlying the Central Valley Project include ensuring an adequate water supply for the area, controlling floods, and generating power.

**4.** Rhône–Poulenc also identifies the Whiskeytown Reservoir as a problem. Although the Whiskeytown Reservoir is located in another watershed, its waters are channeled into the Spring Creek Reservoir through tunnels constructed as part of the Central Valley Project.

Mine is just one of many sources of AMD and the metals found in AMD flowing into the Keswick Reservoir. According to Rhône–Poulenc, EPA has designated Keswick Dam as the point of compliance to determine whether the concentration of metals present in the water accords with State Basin Plan standards.[5] Rhône–Poulenc argues that water passing through the CVP facilities—such as the Shasta Dam and the Whiskeytown Reservoir—contains metals and AMD, not generated by the mining activities at Iron Mountain Mine, and that those metals "collect and commingle in Spring Creek and Keswick Reservoir with discharges of metals from Iron Mountain." As a result, Rhône–Poulenc contends, the overall concentration of metals at Keswick Dam is elevated beyond what it would have been had only metals generated at Iron Mountain Mine flowed there, leading EPA to develop more stringent standards for Iron Mountain Mine than warranted by drainage from the Mine alone and causing Rhône–Poulenc to incur response costs beyond its fair share.

Rhône–Poulenc also makes a second argument with regard to the CVP facilities: Had the United States not dammed the Sacramento River and Spring Creek, the natural flow of the water would have diluted the AMD released from Iron Mountain Mine. According to Rhône–Poulenc, without the dams, the Sacramento River would flow at much greater volume during precisely those times of the year when drainage from Iron Mountain also would be at its peak. Rhône–Poulenc contends that with greater water flows and thus dilution, the metal concentrations in the Sacramento River would be lowered, such that there would have been few, if any, response costs associated with the Mine.

Second, Rhône–Poulenc argues that the United States should be liable because of its ownership of the Golinsky Mine. Like the CVP facilities, the Golinsky Mine is located in the West Shasta Mining District, north of Shasta Dam and Lake. Rhône–Poulenc argues that AMD has been generated at the Golinsky Mine as a result of the mining activities there. According to Rhône–Poulenc, AMD from the Golinsky Mine flows into the Little Backbone Creek, which runs past Golinsky Mine and into Shasta Lake. Water from Shasta Lake, which allegedly is tainted with AMD from Golinsky Mine, then passes through the Shasta Dam into the Sacramento River which feeds into the Keswick Reservoir. There, that water mixes with water from Spring Creek, which contains the AMD from Iron Mountain Mine. According to Rhône–Poulenc, AMD from the Golinsky Mine elevates the overall concentration of metals at Keswick Dam, leading to distorted measurements of AMD from Iron Mountain Mine and overly stringent remedial measures.

Finally, Rhône–Poulenc argues that the United States should be liable for a portion of the response costs because it owns approximately twelve parcels, totaling some 120 acres, on the Iron Mountain Mine site.[6] Of those twelve parcels, Rhône–Poulenc contends that two have generated releases of hazardous substances: a 1.1 acre parcel that lies directly above some of the Iron Mountain Mine workings—namely the Lawson Tunnel and the Richmond Tunnel—and a .18 parcel located above the Richmond Plant. Rhône–Poulenc contends that portions of the 1.1 parcel have subsided due to the parcels' location above the underground mine workings and that water seeps through these subsidence zones into the mine workings creating additional AMD. Rhône–Poulenc further asserts that the .18 acre parcel contains a waste pile which is leaching metals.[7]

---

5. EPA is using the State Basin Plan standards as the applicable or relevant and appropriate standard, or ARAR, for Iron Mountain Mine. *See* 42 U.S.C. § 9621. Under CERCLA, the ARAR is the benchmark by which the effectiveness of a remedial action selected by EPA to clean up hazardous substance contamination is measured.

6. The exact umber of parcels at issue is unclear. There appear to be between ten and twelve on the Iron Mountain Mine site, plus the United States owns another 60 parcels in the vicinity of Iron Mountain.

7. Rhône–Poulenc first raised the .18 acre parcel in the Second Declaration of Ernest Nachreiner and the Third Declaration of Anne Connell, filed on September 24, 1997. The United States moves to strike those declarations, primarily on the ground that they amount to a sur-reply. Because the court does not rely on those declarations in reaching its decision, the court does not address the United States' motion to strike the declarations.

Rhône–Poulenc and the United States have filed cross motions for partial summary judgment on the above counterclaims.[8]

### I. The CVP Facilities and the Golinsky Mine

■ To establish its claim for contribution from the United States, Rhône–Poulenc must show that:

(1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused [Rhône–Poulenc] to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) [the United States] is within one of the four classes of persons subject to the liability provisions of § 107(a).

*3550 Stevens Creek Assoc. v. Barclays Bank,* 915 F.2d 1355, 1358 (9th Cir.1990) (citing *Ascon Properties, Inc. v. Mobil Oil Co.* ., 866 F.2d 1149, 1152 (9th Cir.1989)). The four classes of persons subject to § 107(a) are operators, owners, arrangers, and transporters. *See* 42 U.S.C. § 9607(a).

Rhône–Poulenc argues that the United States is liable for contribution as the owner of both the CVP facilities and the Golinsky Mine.[9] It is undisputed that the United States is the current owner of the CVP facilities and the Golinsky Mine. And for purposes of this motion, the court will assume that there have been releases of hazardous substances from the CVP facilities and the Golinsky Mine.[10] However, for the United States to be liable Rhône–Poulenc also must show that the alleged releases caused Rhône–Poulenc to incur response costs that were necessary and consistent with the national contingency plan. *See* 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B). Rhône–Poulenc has failed to make that showing, and as a result, the United States' motion for summary judgment will be granted with respect to the CVP facilities and the Golinsky Mine.[11]

To date, Rhône–Poulenc claims that it has incurred $ 72.3 million in response costs. These costs fall into two general categories: $ 58.64 million in response costs allegedly were incurred in complying with EPA Administrative Orders and the remainder are

---

**8.** Because Rhône–Poulenc only moved for partial summary judgment as against the United States, no factual or legal finding made in connection with this motion will be binding on plaintiff State of California.

**9.** Rhône–Poulenc also argues that, with respect to the CVP facilities, the United States is liable as an arranger under § 9607(a)(3) and a transporter under § 9607(a)(3). These claims suffer from the same infirmities as Rhône–Poulenc's owner claim and will not be addressed separately.

**10.** Rhône–Poulenc argues that releases, as defined by CERCLA, occur at the CVP facilities as a result of water containing metals passing through those facilities. The United States disputes this premise, particularly as to water that has passed through Shasta Dam. *See Comm. to Save Mokelumne River v. East Bay Municipal Utility Dist.,* 13 F.3d 305, 308 (9th Cir.1993) (distinguishing water that spills over a containment dam which may be a violation of the Clean Water Act to water that travels through a pass through dam); *compare Nat'l Wildlife Fed'n v. Gorsuch,* 693 F.2d 156, 174–75 (D.C.Cir.1982) (pass through dams are not required to obtain a permit under the Clean Water Act because water traveling through those dams are not "additions" of a pollutant).

**11.** The United States also argues that it is immune from Rhône–Poulenc' counterclaim under the Flood Control Act, 33 U.S.C. § 702c. Section 702c provides in relevant part: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place...." The court previously addressed and rejected this argument in *United States v. Iron Mountain Mines, Inc.,* 881 F.Supp. 1432, 1438–1442 (E.D.Cal.1995).

Alternatively, the United States argues that Congress' decision to construct the Central Valley Project and the Bureau's decisions relating to the control of flood waters are not justiciable because the court should not second-guess complex legislative and executive branch decisions. In support of its argument, the United States cites cases discussing the Federal Tort Claims Act's discretionary function exemption provision, 28 U.S.C. § 2680(a). *E.g. Sauders v. South Carolina Public Service Authority,* 856 F.Supp. 1066, (D.S.C.1994). CERCLA has no such provision, and thus this argument in its absolute form is also unpersuasive. However, when framed as an argument as to why the government, even if liable, should pay nothing or very little in contribution, the argument has more force.

monitoring and investigative costs that Rhône–Poulenc incurred voluntarily and that were not directly attributable to compliance with EPA Administrative Orders.

A.

■ According to Rhône–Poulenc, it has incurred response costs due to EPA Administrative Orders requiring the following activities: operation of the Boulder Creek temporary treatment plant; the reconstruction of the Richmond tunnel and sludge disposal area; the construction of the Upper Spring Creek diversion; the construction of an access road and weir; the design and construction of a collection system at Old/No. 8 Seep and an AMD treatment plant; and the capping of waste piles. There is no dispute that all of the above-listed cleanup activities occurred at or very close to the Iron Mountain Mine workings. None of the cleanup activities was located downstream at the Keswick Reservoir—the point at which waters affected by the CVP facilities or the Golinsky Dam might commingle with waters affected by Iron Mountain Mine. Thus, the costs Rhône–Poulenc has incurred to date in complying with EPA Administrative Orders address only releases from Iron Mountain Mine, not releases from the CVP facilities, the Golinsky Mine, or any other potential source of pollution. Because no activity by the United States has generated the AMD releases that Rhône–Poulenc's costs respond to, the United States bears no liability for the response costs. *See United States v. Alcan Aluminum Corp.* (*"Alcan–Butler"*), 964 F.2d 252, 270 (3rd Cir.1992) ("[I]f [the party] proves that the [hazardous substances] did not or could not, when mixed with other hazardous wastes, contribute to the release and the resultant response costs, then [that party] should not be responsible for any response costs.")

Rhône–Poulenc makes the argument that while the cleanup activities may have occurred at or near the Iron Mountain Mine workings, the point at which EPA measured whether Iron Mountain Mine was in compliance with the State Basin Plan standards was at the Keswick Dam. Rhône–Poulenc Opp'n & Reply at 17 n. 27. Thus, according to Rhône–Poulenc, if the focus is on the "point of compliance" at the Keswick Dam where waters affected by the CVP facilities and the Golinsky Mine might commingle with waters affected by Iron Mountain Mine, then the situation here is just like a "garden variety landfill case" in which "many parties and owners have contributed to the contamination of the facility and one party has been required to incur costs in respect of that facility." [12] Rhône–Poulenc Opp'n & Reply at 18. Rhône–Poulenc further argues that when multiple parties contribute to the contamination of a facility, a party seeking contribution from other covered parties need not establish that a particular response cost was caused by a particular party's pollution because causation is not an element of CERCLA. *See United States v. Alcan Aluminum Corp.* (*"Alcan–New York"*), 990 F.2d 711, 721 (2nd Cir.1993) ("CERCLA does away with a causation requirement."); *accord Alcan–Butler*, 964 F.2d at 264–66; *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1152–54 (1st Cir.1989); *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988); *United States v. Wade*, 577 F.Supp. 1326, 1333 (E.D.Pa.1983).

As Rhône–Poulenc would have it, if EPA looks downstream to determine what effect AMD releases and various cleanup measures are having on the Sacramento River, a major waterway, EPA thereby converts the site or the "facility" into the entire Sacramento River basin above Keswick Dam. Once the facility is conceptualized in this expanded way, then Rhône–Poulenc argues that all contributors to pollution in the Sacramento River above the Keswick Dam are responsible for the cleanup of Iron Mountain Mine. Rhône–Poulenc further argues that because the EPA takes measurements at the Keswick Dam, EPA may be insisting on measures at Iron Mountain Mine that it would not have required had the measurements below Keswick Dam been more favorable.[13] Finally,

---

12. For example, in *United States v. Alcan Aluminum Corp.* (*"Alcan–New York"*), 990 F.2d 711 (2nd Cir.1993), EPA ordered the cleanup of a 13 acre waste disposal and treatment center where wastes from over 80 parties had been dumped together indiscriminately.

13. According to the United States, during the administrative process, Rhône–Poulenc opposed EPA's proposal to relocate Sacramento River monitoring to a point upstream above the Spring Creek Debris Dam prior to any admixture of

taking the same broad view of the facility as the Sacramento River basin above the Keswick Dam, Rhône–Poulenc laments that if only the Sacramento River and its tributaries were permitted to run free, AMD flowing from Iron Mountain Mine through Spring Creek would be so diluted in the Sacramento River that the AMD would not cause any difficulty, at least to the Sacramento River. Thus, Rhône–Poulenc pins the blame on the United States for building Shasta, Spring Creek, and Keswick Dams which, by impeding the flow of the waterways, keep Rhône–Poulenc from using those waters to flush out the AMD from the Mine.

■ All of these arguments flounder on the minimal causation requirement in CERCLA. To seek reimbursement a party must show that someone else's release of hazardous substances caused it to incur response costs. While causation may not be an element of CERCLA liability in the sense that a party seeking contribution would be required to show that a particular cleanup activity addressing a multiple-generator site was in response to a particular release, it is stretching CERCLA's strict liability framework too far to impose liability on the United States where the only connection Rhône–Poulenc alleges between the United States and the response costs Rhône–Poulenc has incurred to date is that EPA takes measurements at the Keswick Dam to determine the condition of the Sacramento River. *See Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 935 n. 8 (8th Cir.1995) ("[E]ven when there is an actual release, a plaintiff must establish a causal nexus between that release and the incurrence of response costs."); *accord Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 670–71 (5th Cir.1989); *Louisiana–Pacific Corp. v. Beazer Materials & Services*, 811 F.Supp. 1421, 1426 (E.D.Cal.1993). *See also Reichhold Chemicals, Inc. v. Textron, Inc.*, 888 F.Supp. 1116, 1128–29 (N.D.Fla.1995) ("Causation is a peripheral issue under CERCLA. The plaintiff is not required to link the defendant's conduct or the defendant's waste *firmly* to the release or threat of release.") (emphasis added); *Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 681 (4th Cir.1995). The response costs that Rhône–Poulenc has incurred so far are directed to particular, identifiable areas of AMD release on Iron Mountain. The United States did not cause these releases of AMD from Iron Mountain Mine and the incurrence of response costs by building the Shasta, Keswick or Spring Creek Dams; it did not cause these release or response costs by taking measurements below the Keswick Dam; and it did not cause these releases or response costs by its ownership of the Golinsky Mine or other properties in a different watershed.

In short, all of the response costs incurred to date on Iron Mountain address AMD from Iron Mountain Mine alone. The measures adopted by EPA address the AMD as it comes from the Mine before it is potentially mixed with other sources of AMD or metals pollution. In these circumstances, no activity by the United States has caused Rhône–Poulenc to incur response costs. Further, the court rejects Rhône–Poulenc's effort to conceive of the site as the entire Sacramento River drainage above the Keswick Dam.[14]

---

waters from Shasta Lake and Keswick Reservoir. *See* U.S. Reply (CVP) at 13.

**14.** Taken to its logical limit Rhône–Poulenc's argument would be absurd. For example, if EPA took measurements of the quality of the water in the San Francisco Bay, into which the Sacramento River drains, then Rhône–Poulenc would argue that any person responsible for pollution in the Bay is also responsible for the cleanup of Iron Mountain Mine. *See* Norman Maclean, *A River Runs Through It* 104 (1976) ("Eventually, all things merge into one, and a river runs through it."). Moreover, there are a number of other difficulties with Rhône–Poulenc's arguments. First, EPA does not concede that the Keswick Dam is the "point of compliance" for Iron Mountain Mine. Rhône–Poulenc Exh. 11 at

24:16 – 33:2. Second, EPA has not required that Rhône–Poulenc meet State Basin Plan standards as to waters tested below the Keswick Dam. EPA has temporarily waived compliance with those standards under § 121(d) of CERCLA, 42 U.S.C. § 9621(d) because the pollution from Iron Mountain is so great that those standards are out of reach. Finally, Rhône–Poulenc's argument that the AMD flowing from Iron Mountain Mine would have been diluted had the United States not dammed the Sacramento River and Spring Creek fails because Rhône–Poulenc is not entitled to have the contamination generated at Iron Mountain Mine diluted. *See* 40 C.F.R. § 403.6(d) (providing that under the Clean Water Act dilution is prohibited as a substitute for treatment).

This conception would only be appropriate if the response costs were directed to AMD that was the product of several sources.

Because Rhône–Poulenc has failed to show a nexus between its response costs and the United States' ownership of the CVP facilities and the Golinsky Mine, Rhône–Poulenc's analogy to land fill cases is misplaced. This case is more appropriately compared to cases where a single party generated releases of hazardous substances. *E.g. Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989). In a single generator case, "if the response costs were justified, [the generator] necessarily caused the incurrence of those costs." *Alcan–Butler*, 964 F.2d at 266.

Perhaps at a future time Rhône–Poulenc may be able to establish that EPA ordered Rhône–Poulenc to pay for a cleanup activity addressing such a vast area that sources apart from Iron Mountain Mine must be considered.[15] Rhône–Poulenc also may be able to show that the measurements taken at the Keswick Dam so distorted EPA's perception of the environmental contamination problem at Iron Mountain Mine that the cleanup activities it ordered there were "arbitrary and capricious." *See* 42 U.S.C. 9613(j). However, Rhône–Poulenc has not established either proposition in connection with the pending motion. As a result, the United States' motion for summary judgment is granted as to the response costs Rhône–

Poulenc has incurred to date in complying with EPA Administrative Orders.[16]

### B.

Rhône–Poulenc allegedly has incurred a second category of response costs that were not directly attributable to Rhône–Poulenc's compliance with EPA Administrative Orders. Rhône–Poulenc incurred these costs in connection with the "modeling of water hydrology in Shasta Lake and the Sacramento River above the confluence of Spring Creek in response to modeling prepared by the United States in connection with the proposed enlargement of Spring Creek Debris Dam." Rhône–Poulenc Mem. at 30. According to Rhône–Poulenc, "[t]hese costs were incurred in part to assess the impact [of] releases from Shasta Lake on [Iron Mountain Mine] Superfund Site remedial proposals." Rhône–Poulenc Mem. at 30. The costs claimed exceed $13 million.

■ The United States argues that it cannot be liable for any portion of these monitoring and investigative costs because the costs were not "necessary" and "consistent" with the National Contingency Plan ("NCP") and, as a result of the inconsistency, the costs are unrecoverable.[17] *See* 42 U.S.C. § 9607(a)(4)(B). Necessary costs are costs that are "necessary to the containment and cleanup of hazardous releases." *United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir.1992) (citing *Daigle v. Shell Oil Co.*, 972

**15.** Rhône–Poulenc claims that the United States is seeking response costs consisting of investigative and water sampling expenses throughout the entire region of the Keswick Reservoir and Sacramento River. The court declines to decide on this motion whether such costs, if sought, were consistent with the National Contingency Plan or whether a claim for contribution might lie if such costs were in response, in some part, to releases of hazardous substances from sources other than Iron Mountain Mine.

**16.** The United States also moves for summary judgment on Rhône–Poulenc's claim that it has incurred response costs due to the United States' operation of the Spring Creek Debris Dam. The Spring Creek Debris Dam and Reservoir is located approximately four miles away from both the mine workings at Iron Mountain Mine and the cleanup activities targeting those mine workings. *See* Spitzley Decl. ¶ 10. Thus, to the extent the parties are concerned with the Spring Creek Debris Dam's alleged contribution to the overall contamination of the waters in the Keswick Reservoir, the above analysis in text applies because

Rhône–Poulenc fails to show that the response costs incurred to date are caused by the Spring Creek Debris Dam. The court also notes that, even if Rhône–Poulenc had presented evidence that it had incurred response costs in connection with releases coming from the Spring Creek Debris Dam, the United States likely would be excused from liability under CERCLA's third party defense, 42 U.S.C. § 9607(b)(3).

**17.** "The [NCP] ... guides federal and state response activities. The NCP provides the organizational structure and procedures for preparing for and responding to ... releases of hazardous substances. It identifies methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." *Washington State Dept. of Transportation v. Washington Natural Gas Co.*, 51 F.3d 1489, 1495 (9th Cir.1995) (internal quotations and citations omitted).

F.2d 1527, 1535–37 (10th Cir.1992)). Generally, "investigative costs incurred by a private party after the EPA has initiated a remedial investigation, unless authorized by the EPA" are not considered necessary because they are "duplicative" of the work performed by EPA.[18] *Louisiana–Pacific,* 811 F.Supp. at 1425 (citing *United States v. Hardage,* 750 F.Supp. 1460, 1511–17 (W.D.Okla.1990), *aff'd* 982 F.2d 1436, 1447–48 (10th Cir.1992)); *compare C & C Millwright Maintenance Co., Inc. v. Town of Greeneville,* 946 F.Supp. 555, 560 (E.D.Tenn.1996) (initial or preliminary investigation costs may be recoverable despite failure to comply with the NCP).

■ The only evidence Rhône–Poulenc has provided that arguably shows that its monitoring and investigation were not duplicative of the work performed by EPA is a letter between EPA's Assistant Regional Counsel, Michael B. Hingerty, and Mary Maloney-Huss, Rhône–Poulenc's representative. Rhône–Poulenc Exh. 75.[19] There, Hingerty "request[s]" water quality data collected by Rhône–Poulenc, stating that the data "would be helpful" and that EPA "is interested in assuring that [its model] takes advantage of the information [Rhône–Poulenc] has developed." That EPA was interested in using data collected by Rhône–Poulenc does not establish that Rhône–Poulenc's efforts were distinct from EPA's. Nor does EPA's interest in the data demonstrate that Rhône–Poulenc's monitoring and investigation were necessary to the cleanup of the Iron Mountain Mine site. Given that Rhône–Poulenc has the burden of establishing that its response costs were necessary and consistent

with the NCP, *Hardage,* 982 F.2d at 1442, summary judgment is granted for the United States as to the monitoring and investigatory costs incurred by Rhône–Poulenc in connection with the proposed enlargement of the Spring Creek Debris Dam.

## II. *The Iron Mountain Mine Parcels*

■ Rhône–Poulenc seeks contribution from the United States due to the United States' ownership of some twelve parcels on the Iron Mountain Mine site. These parcels are relatively small, oddly-shaped slivers of land. The United States did not retain ownership of these parcels out of any plan or design; rather, the United States only owns them as a result of mistakes made on the maps submitted by Mountain Copper when it filed its application to acquire a patent for the Iron Mountain Mine site. It appears that the United States was not aware of its ownership of the parcels until this litigation began.

With respect to every parcel except the 1.1 acre parcel that allegedly sits atop Iron Mountain Mine workings and the .18 acre parcel that allegedly contains an eroding waste pile, the United States' motion for summary judgment is granted. As with its CVP facilities and Golinsky Mine counterclaims, Rhône–Poulenc has failed to show—or even argue—that releases of a hazardous substance have emanated from those parcels and that those alleged releases caused Rhône–Poulenc to incur response costs that were necessary and consistent with the NCP.

■ The United States' motion for summary judgment is also granted with respect to the 1.1 and the .18 acre parcels.[20] Even

---

18. In its opening brief, Rhône–Poulenc cites numerous cases on the issue of whether its monitoring and investigatory costs were necessary and consistent with the NCP. All of them are distinguishable from this case. Most of the cases cited by Rhône–Poulenc deal with a private party seeking response costs incurred while EPA was not involved in the remediation of the site. *See United States v. M/V Santa Clara I,* 887 F.Supp. 825 (D.S.C.1995); *Union Carbide Corp. v. Thiokol Corp.,* 890 F.Supp. 1035 (S.D.Ga.1994); *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373 (E.D.N.C.1990). In *Chesapeake & Potomac Tel. Co. of Virginia v. Peck Iron & Metal Co., Inc.,* 814 F.Supp. 1269 (E.D.Va. 1992), the EPA was involved but EPA's site manager acted fraudulently, undercutting confidence in EPA's decisions. There is no showing of fraud

by EPA employees who prepared a model in connection with the enlargement of the Spring Creek Debris Dam.

19. Rhône–Poulenc also cites to three other letters between EPA and Rhône–Poulenc. Rhône–Exhs. 49, 69, 88. None supports the view that Rhône–Poulenc's monitoring and investigation were not duplicative of EPA's work.

20. The United States argues that it is shielded from CERCLA liability for these parcels under the doctrine of sovereign immunity. CERCLA generally waives the United States sovereign immunity. Section 9620(a)(1) provides, in relevant part:

Each department, agency, and instrumentality of the United States ... shall be subject to, and

assuming that all of Rhône–Poulenc's allegations are true,[21] the United States still avoids liability under CERCLA's "third party defense," 42 U.S.C. § 9607(b)(3).[22] To avoid liability under the third party defense, the United States must establish:

1) that a third party was the sole cause of the release of hazardous substances;

2) that the third party was not the [United States'] employee or agent;

3) that the act or omission of the third party causing the release did not occur in connection with a contractual relationship, existing either directly or indirectly, with the [United States];

4) that the [United States] exercised due care with respect to the hazardous substance concerned; and

5) that the [United States] took precautions against foreseeable acts or omissions of the third party.

*Lincoln Properties*, 823 F.Supp. at 1539–40 (quoting *Kelley v.. Thomas Solvent Co.*, 727 F.Supp. 1532, 1539–40 (W.D.Mich.1989)).

Because the third party defense is an affirmative defense to CERCLA liability, the United States has the burden of proof with regard to each of these elements. *See id.* at 1540. With the exception of the second requirement, all of these elements are contested here.

As to the first element—the sole cause requirement—it cannot fairly be disputed that Mountain Copper caused the release of AMD at the two parcels by creating the waste pile on the .18 acre parcel and by mining under the 1.1 acre parcel that has caused subsidence and the alleged release of AMD. *See* Rhône–Poulenc's Resp. to U.S. Statement of Facts ¶ 27. But Rhône–Poulenc counters that it was not the sole cause; according to Rhône–Poulenc the actions and omissions of the United States were also a cause. Specifically, Rhône–Poulenc charges the United States with causing the AMD by allowing miners to enter and mine the two parcels to which the United States held title under the Mining Law of 1872, 30 U.S.C.

---

comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under § 9607 of this title. The United States contends that by providing citizens with the full use of public land for mining under the Mining Law of 1872, 30 U.S.C. § 22 et seq., it was not acting "as any nongovernmental entity" and therefore has not waived its sovereign immunity under § 9620(a)(1). In making this argument, the United States focuses exclusively on the fact that in the past the parcels were subject to unpatented mining claims, which transferred all possessory rights to the claimant while the United States simply held "bare" title to the parcels. However, the United States concedes that the parcels are not "currently subject to unpatented mining claims." U.S. Reply at 11 n. 10. The United States now has full legal and possessory rights to the parcels. Thus, even if the court were to accept the United States sovereign immunity argument, the United States would not be shielded by sovereign immunity from § 9607(a)(1) liability for its current ownership of the parcels. The United States makes a similar argument as to whether it may be deemed an "owner" under CERCLA. Again, whatever the merits of the argument as to the parcels when they were subject to unpatented mining claims, because there are no such claims now the United States is now the sole owner of all possessory interests.

21. Rhône–Poulenc alleges that the 1.1 acre parcel is located directly above Iron Mountain Mine workings, that portions of the parcel have subsided as a result of their location above those workings, that water seeps through these subsidence zones creating additional AMD, and that EPA has capped these subsidence zones to stem the creation of AMD. Rhône–Poulenc further alleges that the .18 acre parcel contains a waste pile that is eroding causing the incurrence of response costs. The United States disputes all of these facts.

22. Section 9607(b)(3) provides:

There shall be no liability under [ § 9607(a) ] for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts and omissions....

§ 22 et seq., and with failing to use its power to regulate that mining to prevent environmental contamination.

The parties generally agree as to how the Mining Law of 1872 operated. The Mining Law declared mineral deposits on public land "free and open to exploration and purchase, and the land in which such deposits are found, to occupation and purchase by citizens of the United States, under regulation prescribed by law, and according to local customs and rules of miners." 30 U.S.C. § 22. The Mining Law then set out the procedures by which a citizen could locate and claim the mineral deposits and the land in which the deposits were found. A citizen could record a claim by filing a notice with the local land recording office. 20 U.S.C. § 28. The United States did not maintain a federal recording system for such claims, as a claimant was not required to provide the United States with notice of his claim at this stage. Upon filing the notice, the claimant would have an unperfected claim to the land and the mineral deposits found there such that the claimant and his heirs and assignee, had "the exclusive right and possession and enjoyment" of the located parcel, although the United States still held legal title to the parcel in trust for the claim holder. 30 U.S.C. § 26; *see e.g. Noyes v. Mantle*, 127 U.S. 348, 351, 8 S.Ct. 1132, 1134–35, 32 L.Ed. 168 (1888) ("Until the patent issued, the government held the title in trust for the locators or their vendees."). This right of exclusive possession permitted the claim holder to exclude all others from the land, including the United States. *Clipper Mining Co. v. Eli Mining & Land Co.*, 194 U.S. 220, 226–27, 24 S.Ct. 632, 634–35, 48 L.Ed. 944 (1904). Aside from collecting a nominal processing fee, the United States did not receive rent from the claim holder for his possession and use of the land nor did the United States receive royalties for the mineral deposits found there. *Forbes v. Gracey*, 94 U.S. 762, 765, (4 Otto 762), 24 L.Ed. 313 (1876). Furthermore, under the Mining Law, the United States could not actively control the mining operations on these lands; Congress left such regulation to the states and local mining districts. *See Topaz Beryllium Co. v. United States*, 649 F.2d 775, 776 (10th Cir.1981). The only power the United States had was to prevent non-mining activities on these lands by retaking a parcel if it were used for some purpose apart from mining. *See e.g. United States v. Curtis–Nevada Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir.1980).

The claim holder could keep his unperfected claim to the located parcel indefinitely so long as he complied with the provisions of the Mining Law. Alternatively, the claim holder could patent his claim. After a claim holder expended $500 on improving the parcel, the Mining Law granted the claim holder the "absolute right" to patent his claim. *United States v. Etcheverry*, 230 F.2d 193, 197 (10th Cir.1956); *see* 30 U.S.C. § 29. A patent transferred full fee title to the land to the claim holder, divesting the United States of any remaining property interest. 30 U.S.C. § 29; *Curtis–Nevada Mines*, 611 F.2d at 1281.

The Ninth Circuit has not yet interpreted the sole cause requirement of the third party defense—or any other portion of the third party defense. But in *Lincoln Properties* this court previously held that the sole cause requirement "incorporates the concept of proximate or legal cause." 823 F.Supp. at 1542. Under this formulation, if the United States' actions or inaction were " 'so indirect and insubstantial' in the chain of events leading to the release, then [the United States'] conduct was not the proximate cause of the release and the third party defense may be available." *Id.; contra United States v. Poly–Carb, Inc.*, 951 F.Supp. 1518, 1530–31 (D.Nev.1996) (adopting the "but for" standard).

The act of permitting miners to enter and mine lands owned by the United States is too indirect to constitute the proximate cause of the AMD at the two parcels on the Iron Mountain Mine. Once Mountain Copper, Rhône–Poulenc's predecessor, located its claim on Iron Mountain, it acquired the right of possession to the land, and the United States was powerless to control how the mining occurred. Rhône–Poulenc cannot now claim that the United States shares responsibility because it permitted Mountain Copper to create the problem at Iron Mountain. Thus, while AMD may have been created on, and released from, the 1.1 and .18 acre parcels, any conduct by the United States in permitting mining to occur, as part of a

national program, is too remote from the generation of the AMD to find that the United States' conduct was a "cause" of the releases. *See Lincoln Properties*, 823 .F.Supp. at 1542. Neither is the United States' failure to regulate mining so as to prevent environmental contamination the legal cause of the AMD at Iron Mountain Mine. "It could always be said to be 'foreseeable' that laws ... retarding industrial activity will ... decrease pollution in the aggregate, and that any particular release ... might have been prevented or reduced with the passage of [a law]." U.S. Reply at 27. However, that cannot be the threshold for legal or proximate cause. If it were, the United States would be one of the "causes" of contamination in every CERCLA action because the federal government always could have enacted legislation regulating industrial activity.

 Rhône–Poulenc also contends that the United States cannot assert the third party defense because the government was in a contractual relationship with Rhône–Poulenc or its predecessors. CERCLA defines the term "contractual relationship" to include "land contracts, deeds or other instruments transferring title or possession." 42 U.S.C. § 9601(35)(A). Rhône–Poulenc argues that this definition "surely encompasses" the land transfers made under the Mining Act in connection with the Iron Mountain Mine site. Rhône–Poulenc analogizes these transfers to a lease or grant of an easement. However, courts universally have held that "[n]either the terms of the General Mining Law nor the administrative regulations implementing that Law can legitimately be viewed in contract terms." *Clawson v. United States*, 24 Cl.Ct. 366, 370 (1991). Moreover, the acts or omissions of Mountain Copper did not occur "in connection with a contractual relationship" with the United States. The Mining Law of 1872 was not a contract between the United States and Mountain Copper for the mining of Iron Mountain let alone for the. generation of AMD. *See Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp.*, 964 F.2d 85, 89 (2nd Cir.1992) ("a landowner is precluded from .raising the third-party defense only if the contract between the landowner and the third party .somehow is connected with the handling of hazardous substances").

 Rhône–Poulenc also argues that the United States should be barred from asserting the third party defense due to contracts the United States entered into with Mountain Copper during World War II to secure raw materials for the war effort. There are a number of obstacles in the way of this argument. To begin with, all of these contracts were with the Metals Reserve Company or with its parent, the Reconstruction Finance Corporation, and not with the United States. The Metals Reserve Company and the Reconstruction Finance Corporation were corporations distinct from the federal government. The Supreme Court has described the Reconstruction Finance Corporation as a corporation with the federal government as its sole shareholder. *See Reconstruction Finance Corporation v. J.G. Menihan Corp.*, 312 U.S. 81, 82, 61 S.Ct. 485, 486, 85 L.Ed. 595 (1941). The Supreme Court noted that "[w]hile [the Reconstruction Finance Corporation] acts as a governmental agency in performing. its functions, still its transactions are akin to' those of private enterprises...." *Id.* As a result, when the Reconstruction Finance Corporation, or its subsidiary, the Metals Reserve Company, entered into contracts to' which those entities, as opposed to the United States, were parties, they were acting as a "separate entity from the government as sovereign." [23] *Reconstruction Finance Corp. v.*

---

**23.** Rhône–Poulenc cites *Cherry Cotton Mills v. United States*, 327 U.S. 536, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946), for the. proposition that the Reconstruction Finance Corporation and the Metals Reserve Company are governmental agencies, not entities separate from the United States. In describing the Reconstruction Finance Corporation, the Supreme Court stated: "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency· selected by Government to accomplish purely Governmental purposes." *Id.* at 539, 66 S.Ct. at 730 (citing *Inland Waterways Corp. v. Young*, 309 U.S. 517, 524, 60 S.Ct. 646, 650–51, 84 L.Ed. 901). But *Cherry Cotton Mills* is distinguishable because in the circumstances of that case the Treasury had treated the Reconstruction Finance Corporation as if it were an agency of the government. In *Cherry Cotton Mills* a taxpayer sued to obtain a tax refund which the Treasury owed to him but paid to

*Chromium Products Corp.,* 202 F.2d 664 (9th Cir.1953) (finding that the Reconstruction Finance Corporation was acting as a separate entity when it entered into a leasing agreement); *see United States Shipping Board Emergency Fleet Corp. v. Tabas,* 22 F.2d 398, 399–400 (3rd Cir.1927) (finding that the Shipping Board was a separate corporation of which the United States was the sole shareholder and that the Shipping Board, but not the United States, could be held liable for breach of a contract entered into by the Shipping Board); *United States Shipping Board Merchant Fleet Corp. v. Harwood,* 281 U.S. 519, 525–26, 50 S.Ct. 372, 373–74, 74 L.Ed. 1011 (1930) (Shipping Board bound by contract as a separate entity). Here, the Metals Reserve Company entered into contracts with Mountain Copper in its own name, not on behalf of the United States. *E.g.* Rhône–Poulenc Exh. 60 (World War II Motion). Thus, the United States had no "contractual relationship" with Rhône–Poulenc or its predecessors because of wartime contracts with the Mining Reserve Company.

In addition, in the particular circumstances here, it would be a strained application of the "contractual relationship" proviso to deprive the United States of the third party defense when, at the time of contracts, neither the United States or Mountain Copper knew that the United States was the owner of these two slivers. Both entities believed that these parcels were within Mountain Copper's patent. Yet the due care language in § 9607(b) assumes that the liable person has sufficient control as an owner, or otherwise liable person, to exercise due care "in light of all relevant facts and circumstances" and to take precautions. Given the shared assumption that the land was under Mountain Copper's

patent, and that no contract called specifically for the mining of these two parcels, the acts or omissions of Mountain Copper in generating AMD at these two locations did not occur "in connection with a contractual relationship." [24]

Finally, Rhône–Poulenc argues that the United States did not exercise due care or take the precautions necessary to permit it to assert the third party defense. CERCLA requires that the party asserting a third party defense show that it "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances" and that it "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions." 42 U.S.C. § 9607(b)(3); *see Lincoln Properties,* 823 F.Supp. at 1543. Courts have interpreted this requirement by looking to the legislative history of CERCLA, which provides that the party asserting a third party defense " 'must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances.' " *State of New York v. Lashins Arcade Co.,* 91 F.3d 353, 361 (2nd Cir.1996) (quoting H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 34 (1984)). This includes "those steps necessary to protect the public from a health or environmental threat." *Id.* (citations and internal quotations omitted).

■ Rhône–Poulenc argues that the United States knew Iron Mountain Mine was being mined extensively throughout the relevant period and suggests that the United

Reconstruction Finance Corporation to partially liquidate a debt the taxpayer owed to that agency. The Court of Claims determined that it had jurisdiction to hear the United States' counterclaim against the taxpayer on the ground that the Reconstruction Finance Corporation was not a separate entity from the United States. Moreover, in *Reconstruction Finance Corp. v. Chromium Products,* 202 F.2d 664 (9th Cir.1953), the Ninth Circuit explained that there would be times when the Reconstruction Finance Corporation's actions would be closely aligned with the federal government so as to blur its separate-

ness. *See* 202 F.2d at 666 (distinguishing the contract provision to mine chromium which Reconstruction Finance Corporation undertook as a separate entity from the provision that the government may restrict Reconstruction Finance Corporation's operations).

24. Alternatively, were the United States technically liable, the court would not award any portion of the response costs in contribution to Rhône–Poulenc because of the United State's fortuitous ownership of the two parcels.

States should have foreseen the creation of AMD and taken appropriate precautions. According to Rhône–Poulenc, the appropriate precautions would have been to better monitor and regulate the mining at Iron Mountain Mine. However, throughout this period the United States was the title holder to millions of acres of Western land, much of it occupied and mined by prospectors and mining companies. Moreover, under the provisions of the Mining Act, states and local mining districts, not the United States, regulated mining operations on those lands. Given the extent of the United States' holdings and its lack of actual control over mining operations, it would be unreasonable to expect the United States to have discovered that AMD was being released from the 1.1 and .18 acre parcels on Iron Mountain. *See Town of New Windsor v. Tesa Tuck, Inc.*, 935 F.Supp. 310, 313–14 (S.D.N.Y.1996) (suggesting that there is no duty to discover a contamination problem caused by a third party). As to Rhône–Poulenc's suggestion that the United States should have enacted legislation to better regulate the mining industry, that is not what the due care requirement contemplates. The due care requirement is aimed at encouraging a landowner to exercise due care and take precautions with respect to "the hazardous substance concerned" at the particular site in question. *See* 42 U.S.C. § 9607(b)(3). The due care requirement does not set a standard for legislative activity.

As to the particular parcels, once the full extent of the AMD problem at Iron Mountain Mine became known, the United States ordered that remedial measures aimed at stopping the release of AMD from Iron Mountain Mine be taken. The United States has caused the 1 .8 acre parcel to be capped to reduce the creation of AMD.[25] Moreover, approximately 30 years prior to the enactment of CERCLA, the United States constructed the Spring Creek Debris Dam, in part to stem the flow of AMD-tainted water from Iron Mountain Mine into the Sacramento River. Rhône–Poulenc Exh. 169. In the circumstances, the United States' actions were a reasonable response to the AMD contamination at Iron Mountain Mine, includ-

ing the two parcels. *See Tesa Tuck,* 935 F.Supp. 310 (finding that the Department of Transportation had exercised due care when it had removed contaminant-generating landfill materials from its property).

Because the United States has established each element of the third party defense with respect to the 1.1 and .18 acre parcels, the United States' motion for summary judgment is granted as to those two parcels as well.

III. *Conclusion*

For the reasons and to the extent stated above, the United States' motion for partial summary judgment is GRANTED, and Rhône–Poulenc's motion is DENIED.

IT IS SO ORDERED.

---

25. It is not clear from the record whether steps have been taken to remediate the mining waste on the .18 parcel or whether there is any evidence that hazardous substances are leaching from the pile.